THE CITY OF LAREDO V. C. MACDONNELL AND THE FERRY CO.

1. GRANT—CITIES.—The city of Laredo, which was founded in 1767, received at the time a grant of four leagues of land from the King of Spain, on the north side of the Rio Grande River, which was afterwards ratified and confirmed by the government of Texas, after its separation from Mexico.

2. DEED—ORDINANCES—RATIFICATION.—The charter of the city of Laredo, granted in 1848, authorized the mayor and aldermen to sell and dispose of any property of the city for the benefit thereof. Under this charter, an ordinance was passed authorizing the mayor to "sell city lots," and another authorizing him to sell "lot or lots," "block or blocks" of the city. The mayor, Refugio Benavides, executed, October 13, 1875, a deed conveying "ten lots, number —— in block number ——," describing land belonging to the city, fronting the river, and which had been always used by the public, upon which the purchasers established a ferry. The land described had never been laid off in lots or blocks: *Held*—

  1. That the power of the mayor to sell was limited to property which had been laid off into lots or blocks.

  2. To say that the mayor, by calling in the deed for the number of lots which the land sold by him would make, if surveyed into lots, could make a valid sale of the land, lacks even plausibility for its support.

  3. A subsequent resolution of the city council, to the effect "that it is the opinion of this corporation that the intent of the parties to said deed was to convey ten lots on said river front, in accordance with the survey," &c., did not validate the conveyance.

4. Such a resolution does not show that the council intended to ratify, or supposed that it had ratified or confirmed, the unauthorized act of the mayor.

3. RATIFICATION—DEED.—A deed was executed on the 15th of October, 1875, by Refugio Benavides, the mayor of Laredo, conveying, without authority of any ordinance, certain land within the city, and fronting on the river, embracing a ferry landing. Afterwards, on December 27, 1875, the city council of Laredo passed a resolution "that all acts, deeds, and contracts whatsoever, orders, obligations, or contracts, executed or to be executed, heretofore made and performed during the year 1875 by his honor the mayor, Refugio Benavides, on behalf of and in the name of the city of Laredo, be, and the same are hereby, approved, confirmed, and ratified by the city council of the city of Laredo " : *Held*—

1. Since the deed upon its face, in connection with other facts, shows that its procurement was part of a secret, premeditated scheme to secure, without the knowledge of the mayor, a ferry franchise opposite the city; that the phraseology of the deed was framed to accomplish this object, and yet so worded as to mislead a credulous and confiding mayor, ignorant of the language, and that such secret scheme was concealed until after the adoption of the resolution,—the resolution of the council did not validate the deed.

2. See opinion for facts held sufficient to prevent the resolution from having the effect to ratify and validate the deed.

4. RATIFICATION.—The ratification of a former act is not binding, unless the act relied upon as constituting the ratification is done with a full knowledge of all the circumstances surrounding the original act.

APPEAL from Webb. Tried below before the Hon. Edward Daugherty.

Most of the material facts are stated in the opinion. The pleadings were quite lengthy, containing much matter not necessary to refer to.

In the year 1767 the city of Laredo was founded as a frontier protection against the savages. The Spanish Government, by the public act of foundation known as the "Vicita-General,"* (which laid off and established Laredo in the months of

---

* The "Vicita-General" is a document containing the written proceedings of the Royal Commission that founded Laredo. Some similar record perpetuates the history of the proceedings at the founding of all Texas towns established in the last century.

May and June of that year,) granted to the inhabitants of the town a ferry privilege in these words: "Which ferry we do hereby declare common property of the town, for which reason the householders and inhabitants of the same shall not pay any charges at the crossing, but be responsible for keeping the same in order, and for strangers passing the river we fix the charge at two reals per head, and at one real for each package of freight. * * * After this work [the church] has been completed, the proceeds shall be deposited for some other use necessary or convenient for the community," &c.

By the same "Vicita-General" the town was given "exidos" or commons of four square leagues of land, having the principal plaza of the town for a centre, and by the general act of the Legislature of Texas of September 4, 1850, section 1, this grant was confirmed to Laredo. It was conceded by both parties that the city was, on October 16, 1875, the day appellees procured their deed which appellant sought to cancel, the undisputed owner of the land in question.

The mayor of Laredo, Refugio Benavides, by whom the deed to Macdonnell was signed, amongst other things, at the trial testified as follows: "Macdonnell never came himself to me to buy any lots. The secretary (James) told me that Macdonnell wanted to buy. I did not see Macdonnell. The secretary did not tell me where the lots were situated that Macdonnell wanted to buy. He gave me no description of the lots or their locality. I had confidence in him in such matters. Many times I was out of town during my term of office, and when I would return the secretary would have a number of deeds written out, and would say, 'Here are deeds for city lots; you must sign them,' and I would sign them accordingly. I was in town when this deed was signed. I never while I was mayor sold any city lots having their boundary on the water's edge. I never knowingly or intentionally sold any land on the water's edge where the ferries cross in front of the city. James never informed me when I was signing this deed that I was selling any lots along the river edge. He told me

Macdonnell wanted to buy lots, but not where they were situated.    This book [Corporation Record of Deeds] is the record which the corporation kept while I was mayor to show which lots had been sold.    Within the limits of the map of the corporation I had authority to sell lots, but outside of those on the map I had no authority to sell, except by special ordinance.    *    *    *    [Here map of the city shown witness.] This map is the map used while I was mayor to show where the lots were that were sold.    There was no other map used. *    *    *    I had no conversation with Peterson in regard to the locality of Macdonnell's purchase.    This is the corporation record of deeds of lots sold.    *    *    *    At the time the sale [to Macdonnell] was made this record of it was made.    I cannot speak or read English, and cannot understand it when it is spoken to me.    *    *    *    There were a great many deeds made by me while I was mayor, and all in English.    The secretary knew how to read English, and he wrote the deeds."

Lazaro de la Garza, the secretary of the city, testified as follows: "I am the present city secretary.    I was present at the council meeting on Saturday, 14th instant, when Macdonnell presented a petition to the city council to approve or confirm his deed of 16th October, 1875.    Atanacio Vidaurri, the mayor, and Thomas Villastrigo, Thomas Ryan, H. Poggenphol, and Vicente Flores, aldermen, were present.    Mr. E. F. Hall, R. Martin, and C. M. Macdonnell were present at this meeting.    They were present through the whole proceedings. Hall explained the petition of Macdonnell.    The mayor refused to sign the resolution, and Hall told him it was his duty to sign it.    He told the mayor, 'If you don't sign that document I'll make you.'    The mayor still refused to sign it, and he never did sign it."    *    *    *    *    ."Alderman Thomas Villastrigo is in the employ of Mr. R. Martin.    Has been in Martin's employ two or three years.    He is employed as a salesman in Martin's store.    Alderman Thomas Ryan is in the employ of Mr. C. M. Macdonnell.    He is a salesman for Mr.

Macdonnell. He has been employed by Mr. Macdonnell for three or four years."

There was a judgment for defendants, a jury being waived; from which the city of Laredo appealed.

*Edmund J. Davis,* for appellant.

I. The deed to Macdonnell was clearly shown to have been procured from a man ignorant of the language in which it was written, and all the evidence shows it was impossible that he could, when signing it, have known where the land was afterwards to be surveyed, or how the deed would operate on the ferry question. Justice Coleridge, in Carr & P., 124, says: "If a man were induced to execute an instrument supposing it to operate in one way, whereas it operates in another, such an instrument would be invalid." (2 Hill. on Real Prop., 433; Moreland *v.* Atchison, 19 Tex., 310; Ellis *v.* Mathews, 19 Tex., 390.) Also, although mere inadequacy of price will not vitiate a sale, yet where that inadequacy is so gross as in this case, that circumstance, in connection with others developed, ought to vitiate it. (Hov. on Frauds, 154; Burch *v.* Smith, 15 Tex., 224; McFaddin *v.* Vincent, 21 Tex., 57.)

And the pretense that the mayor recognized, and thereby confirmed, this deed in the one he made to McComb, would not help defendants even if they had shown that he deliberately intended that thing, because he had no adequate authority to do that; and the acts of a corporate officer, unless official or in respect to his agency, are no more operative, as against the corporation, than those of any stranger. (National Bank *v.* Norton, 1 Hill, 572.) All the mayor's "powers and duties depend entirely upon the provisions of the charter, or constituent act of the corporation, and valid by-laws passed in pursuance thereof." (Dill. on Mun. Corp., sec. 147.)

II. Did the city have the right to the ferry franchise when the defendants intruded, and herein of this right, under the grant of ferry from the former sovereign; under prescription; under

ownership of the land by force of the general laws of the State, and under the act of incorporation of January 28, 1848?

Certainly the grant from the Government of Spain was positive and distinct, and if that were not sufficient, the prescriptive right of the ferry—an incorporeal hereditament—was clearly proved. "In this country the doctrine of Bracton, that a grant of lands, as well as incorporeal hereditaments, may be presumed, seems to have been generally adopted." (2 Hill. on Real Prop., 159.) "A franchise of a ferry is an incorporeal hereditament." (1 Bouv. Law Dic., 581.) Twenty years in most of the States is considered sufficient to establish a grant of this kind by prescription. (3 Kent's Comm., 441, note *e.*) In Texas, our Supreme Court has been rather vague in defining the term of years of continued use and claim that will raise a presumption of a grant. In cases analogous to that provision of the statute of limitations in Paschal's Digest, 4624, they have presumed a grant after ten years; (Herndon *v.* Casiano, 7 Tex., 332; Paul *v.* Perez, 7 Tex., 338; Charle *v.* Saffold, 13 Tex., 111, and other cases;) while, on the other hand, they have sometimes intimated that a still longer term would be required; as, for instance, in Grimes *v.* Corporation of Bastrop, 26 Tex., 312. But if the right in this case depends on proof of prescription, the city has shown herself to have been in possession even longer than the long time (forty years) required by the laws of Spain to create a presumption of grant. (White's Recop., p. 95.) However, it cannot be pretended that the right of the city depends only on possession.

And if neither of these grounds of title were sufficient, then the city had the ownership of the land, and under the general law of January 23, 1850, relating to ferries, this would confer the right even apart from the act of incorporation of January 28, 1848. "The grant of a ferry confers on the grantees an exclusive right, but the extent of the right must depend on the terms of the grant. The grant of an exclusive right to take toll at a ferry is not a monopoly." (2 Hill. on Real Prop., 41.) The act of incorporation, when it gave to the city the

right "to establish ferries,"   *   *   *   "fix the fees and rents of the same," certainly must have intended that the people of the city should enjoy those fees and rents. This act was, therefore, in itself, a complete grant of the ferry franchise.

The decree and judgment of the court below seem to indicate an opinion, on the part of the judge, that while the city had once an exclusive right to this franchise, yet that the Legislature had, by the general incorporation act of 1874, authorized a revocation of it in favor of those who might, organized under that act, get possession of a piece of land on the margin of the river and secure a license from the County Court. Now, it is true the Legislature can repeal an act of incorporation of a municipal body or abridge any of its powers, but it does not follow that property conferred on a city for the common use and benefit of the people living there can also be taken away and given to some one else. In such event the municipal corporation might be considered sometimes as a trustee, and on the abolition of the corporation a court of equity would appoint a new trustee to take care of the property and execute the trust. (29 Vt., 12; 9 Cranch, 43, 292.) It is further the law, however, that "a construction which repeals former statutes and laws by implication is not to be favored in any case." (Neill *v.* Keese, 5 Tex., 33; Bryan *v.* Sundberg, 5 Tex., 424; 8 Tex., 62.) It can only be pretended by defendants that the act of incorporation of the city, in respect to its power over the ferries within its limits, was repealed by "implication" in the general act of January 23, 1850, or in the act "concerning private corporations" of April 23, 1874. In regard to the latter of these acts, the defendants have simply mistaken the intent and purpose, which manifestly were not to give any individual or company authority to establish a ferry where one existed already, or to divest any established rights, and it is not necessary to discuss the point. But the act of 1850 is remarkable, in its bearing on this question, in the circumstance

that when the act of incorporation of Laredo was passed (1848) the fifth section of the act of January 19, 1841, regulated ferries—putting them under control of the County Courts generally, in almost the substantial terms of the act of 1850—indicating that the Legislature purposely made an exception in favor of Laredo, by giving it, within its limits, the power to establish and maintain ferries, which elsewhere in the State was vested in the County Courts. And, as we have noticed above, when the act of January 19, 1841, was repealed by that of 1850, the Legislature seems, as if designedly, to have still left this power in the corporation of Laredo; anyhow, there was no repeal, even by implication. And we see further, that the provisions of the Constitution of 1876, article 12, title PRIVATE CORPORATIONS, though they declare the reserved authority of the State to regulate freights, tolls, &c., collected "for the use of highways, landings, wharves, bridges, and ferries devoted to public use," yet in the seventh section expressly declare that "nothing in this article shall be construed to divest or affect rights guaranteed by any existing grant or statute of this State or the Republic of Texas."

*William H. Russell,* for appellees.—It will be seen that the city council, on the 27th of December, 1875, by express resolution ratified and confirmed all "deeds" made by the mayor, Refugio Benavides, during that year. This resolution was passed with a full knowledge of the deed to Macdonnell, as such deed had been, on the 19th of October, 1875, duly registered in Webb county, and was also, on the 16th of October, placed on the record-book of the council.

The doctrine is too well settled to need any argument or authorities, that if an agent do an unauthorized act which is afterwards ratified by the principal, the act becomes that of the principal.

The council, on April 14, 1877, put their interpretation of this deed on record in their book of proceedings, and which was signed by four aldermen and attested by the secretary, the

mayor, who was present and presiding, refusing to sign the same.

An inspection of the city charter will show that the mayor is not required to sign, though he must preside over the meetings of the council, which he did, as City Secretary Garza says, until "the minutes were ready to be signed, when he told the aldermen they might sign them, but he would not."

"The presiding officer and three aldermen, making a majority of the whole council, shall constitute a quorum. (City Charter, sec. 7.)   The clerk shall keep a record of all proceedings."

Thus we have two acts of the city council, each ratifying and confirming the deed to Macdonnell, passed by a full quorum, and the record kept and attested by the proper officer, one a general confirmatory act, December 27, 1875, and one of April 14, 1877, especially referring to the deed and survey.

The counsel of appellant complains of the first one, because it does not refer specifically to the deed; and of the latter, because it was asked for by some of the gentlemen composing the company, and because some of the aldermen were clerks of these gentlemen, not showing that these aldermen had any interest, direct or indirect, in the purpose of the act.

Refugio Benavides, the ex-mayor, says: "I never knowingly sold any lots having a boundary on the water's edge. I never knowingly or intentionally sold any land on the water's edge. James never informed me, when I was signing the deed, that I was selling any lots along the river's edge." Yet on his cross-examination he says he knows the lots he sold to Santos and Cristobal Benavides, his brothers. If this last be true, a reference to the records will show that he did what he says he did not do.   The deed to these lots calls as follows: "Said lots front on River street twenty varas each, and run south to the river Rio Grande forty varas each.". These are the lots for which Macdonnell's deed calls for as a starting point, and which an old and experienced surveyor, Major Blucher, says that, from the deed, in surveying them he would run to the river.

So, according to Benavides' own statement, he sold these

lots to his brothers, and knew where they are situated, with the deed calling for the river.

Again, there is found another deed from this same ex-mayor to his brother, Cristobal Benavides, to two lots in block O, calling as follows: "Said lots front twenty varas each on the Rio Grande River, and run back," &c.

The deeds all call for the river, and they are not questioned. Is it because the owners are brothers of the ex-mayor, who instituted this suit, or because they have not induced the County Court to establish a ferry opposite their lands? At all events, the situation of the lands, in connection with his statements, that he never sold lots on the river, and that he knew the situation of the Benavides lots, shows how worthy of belief is the evidence of this ex-mayor.

Moore, Chief Justice.—This suit was brought by the appellant, the city of Laredo, against appellee, C. M. Macdonnell, in the District Court of Webb county, on May 13, 1876, to cancel and annul a deed made by Refugio Benavides, as mayor of the city of Laredo, to said Macdonnell on October 16, 1875, for a tract or parcel of land. The land was described in said deed as "lying and being in said city, and known on the map of said city as ten lots, number —— in block number ——, situated, bounded, and described as follows, to wit: On the east bank of the Rio Grande River, and running forty (40) Mexican varas for depth, more or less, commencing at a lot or parcel of ground on the said bank owned by Santos and Cristobal Benavides and running up said river with its meanders for quantity"; which said land was by said Macdonnell conveyed by deed of date of March 7, 1876, to the Laredo Ferry Company. The Laredo Ferry Company, by an amended petition filed October 9, 1876, was also made a party defendant to the suit.

The grounds relied upon by appellant for canceling or declaring said deed to Macdonnell to be null, as alleged in the original and amended petitions, were, in effect—

1st. Said deed had been fraudulently altered subsequent to execution by the insertion of the figures " 10 " above and between the words " as " and " lots," with the intent and purpose of changing the legal import of the instrument.

2d. That the mayor of the city had no authority to sell the land described in said deed.

3d. That the mayor not understanding English, the language in which the deed was written, was ignorant of its contents and purpose.

4th. That the consideration ($50, which was proffered back) paid for the land was grossly inadequate; that if. the land conveyed by said deed carried the right or privilege of establishing a ferry, as claimed by appellees, it was worth at least $50,000.

5th. That the ferry company, of which Macdonnell was a member when he purchased, was informed, when the deed was made to it by Macdonnell, of all the facts and circumstances under which the deed to him was made.

Appellees, in their answer, allege that the deed of the city of Laredo to Macdonnell, executed by its mayor, was properly executed for a good and valuable consideration, and without fraud, &c. If said deed was originally invalid, it had, subsequently to its execution, been twice ratified and confirmed by said city; that said ferry company had not at any time any knowledge of any ignorance or mistake of said mayor in executing said deed, or of any fraud practiced upon him, if indeed such was the fact.

A jury was waived by agreement. The case was submitted for determination to the court, and judgment was rendered for the defendants.

There was ample testimony before the court to prove that the figure " 10," which appellant insists was added after the execution of the deed, was interlined before it was signed by the mayor. However plausible, therefore, the contrary may be made to appear by the ingenuous presentations of the circumstances relied upon by counsel to maintain the contrary

conclusion, this point must be regarded in this court as conclusively settled against appellant by the judgment of the court below.

But conceding that the deed to Macdonnell has not been altered, was it a valid conveyance of the land described therein when executed ?   Or if not, has it since been validated by appellant ?   These questions must, in our opinion, be answered in the negative.

The city of Laredo, as is shown in the record, was founded as early as the year 1767.   It received at its foundation from the King of Spain, as is shown by the "Vicita-General" by which it was founded, a grant of four leagues of land on the north side of the Rio Grande River, which grant was ratified and confirmed by a patent from the government of Texas since its separation from Mexico.   On a portion of this tract, along and back from the river bank which marks the line of "high water," a regular city was laid out in the year 1767, as shown in the "Vicita-General," with blocks, lots, and streets running to the cardinal points of the compass.   Additional blocks, lots, and streets were subsequently laid off, surveyed, and platted on the map, as the wants of its inhabitants demanded or public interest required; while that part of the grant not embraced in the limits of the city has been disposed of or is still retained as property of the city.

The land claimed by appellees under the deed to Macdonnell, it was admitted on the trial, belonged to the city at and previous to the date of this deed.   It is situated as claimed, and was subsequently surveyed by appellees at and along the water's edge, and entirely upon the flats between the river at its low or ordinary stage and the first bluff or bank which marks the line of high water, just over and below which the blocks and lots previously surveyed and sold stop.   The full blocks, as surveyed and platted by the city, are subdivided into ten lots of twenty by forty varas, five of them fronting south towards the river, and five north or back from it.   It is not pretended that these flats in front of the city had ever been

surveyed into lots of any size or shape. But the proof offered by appellant shows that they had always, previous to the execution of this deed, been used as "a landing and common highway for passengers and freight going and coming across the river." Locating this land as appellees caused it to be surveyed, it falls short nearly fifty varas of reaching the lots at which it calls to commence. If commenced and surveyed adjoining the lots called for, it crosses and includes part of two of the principal streets of the city, and embraces a part of two blocks, but does not embrace ten lots in any block as previously surveyed or platted, or go to the river's edge, as appellees claim; or if it should be so surveyed as to do so, it will include nearly three times the quantity of land called for in the deed.

The larger portion of these flats, and that especially now claimed by appellees, had from time immemorial, almost, been used by the public, if indeed it had not been dedicated to its use. It was, as the testimony in the record shows, almost entirely valueless to private parties, unless by its appropriation they are permitted to make such public uses as had been previously made of it a source of private gain.

Now, passing by the question of alleged fraud in obtaining this deed, whereby the city, for the paltry sum of $50, is alleged to have parted with property which appellees claim entitles them to the privilege of a ferry which the city was leasing previous to the institution of this suit for $2,900 per annum, and admitting that the mayor was not overreached in what he did by those more cunning and designing, as well as better informed, owing to his ignorance of the language used in consummating this transaction, if it can be considered possible to do so, to uphold this deed it must still be made to appear that the mayor had authority to sell the property which is here in dispute. To determine whether such authority was vested in him, reference must be had to the charter and ordinances of the city under and by virtue of which he acted.

The act to incorporate the city of Laredo, approved January

28, 1848, contains the following provisions bearing upon this question:

"SECTION 2. Be it further enacted, That the limits of the city of Laredo shall be one square mile and bounded in the following manner, viz.: The Rio Grande shall constitute one line, and the upper and lower lines shall be equidistant from the public square or plaza, and, running back from the river parallel to each other, shall intersect the back line at right angles. The lines shall all be one mile in length, and forming, as near as the meanders of the river will permit, a perfect square."

"SECTION. 5. Be it further enacted, That the mayor and aldermen shall be invested with the following powers, viz.: First. They shall have authority to make and pass all by-laws and ordinances not repugnant to or in violation of the Constitution, &c.   *   *   *   Thirdly. They shall have authority to establish ferries, build levees, wharves and landings, fix the rates, fees, and rents of the same, &c.,   *   *   *   and sell and dispose of any property belonging to the city, for the benefit thereof."

It was admitted on the trial that the only ordinances under which the mayor could have acted in making sale of the land described in this deed, were as follows, to wit: "Resolution relative to the sale of city lots.   Be it resolved by the mayor and board of aldermen of the city of Laredo, That the mayor be, and is hereby, authorized to sell city lots; the purchaser paying $5 for the corporation, $1 mayor's fees, and 50 cents city surveyor's fees.   Approved January 3, 1874;"—and "An ordinance relative to the sale of lots and blocks, approved February 9, 1874," whereby the mayor was authorized to sell lot or lots, block or blocks, to any person who will deposit one-fifth of the purchase-money with the mayor, who thereupon should give the purchaser a certificate of possession, and if such purchaser should, within six months, inclose the property sold with a good and substantial fence, to be approved by the mayor, then on the payment of the remainder of the purchase-money the purchaser should be entitled to a deed.

Of course there is, and can be, no pretense that this deed was made under authority of this last ordinance; and, as is obvious, the first only authorized the mayor to sell lots, and not tracts or parcels of land, belonging to the city, which had not been laid off into lots. The land claimed by appellees, as has been said, had not been laid off as lots so as to be subject to sale by the mayor. The designation of it in the deed, as ten lots, merely indicated with additional certainty that the land embraced by the boundaries in the deed corresponded in quantity with that number of lots of the size of the city lots. To say that the mayor, by calling in the deed for the number of lots which the land sold by him would make if surveyed into lots, could make a valid sale of land, would be a most unreasonable and unwarranted construction of the ordinance, and would lack even plausibility for its support. The entire evidence shows that no such construction had ever been given to or claimed for it.

The mayor who signed the deed, in his testimony as a witness says: "I never while I was mayor sold any lots having their boundaries on the water's edge. I never knowingly or intentionally sold any land on the water's edge, where the ferries cross in front of the city, * * * within the limits of the map of the corporation. I had authority to sell lots, but outside of those on the map of the corporation I had no authority to sell, except by special ordinance." And again: "I would not sell lots that interfered with the ferry on the river. Selling lots there" (*i. e.*, where the lots in question are claimed by appellees) "would disturb the ferry. Besides, I had no authority to sell them on the river flat."

Another witness, who had been mayor of Laredo for three or four years previous to 1872, and who, by consent, made an extract from the city map, so far as the same is applicable to the question at issue, says: "I am well acquainted with the city tract and the lots and blocks of the city. The lots and blocks are laid off by due north and south, east and west courses; all lots and blocks are laid off in that way. * * *

Without a special ordinance no sale of any tract of the city lands has ever been made, except city lots and blocks laid off on the city map, the sale of which is authorized under general ordinance of the city. I have known two cases of donation or sale of tracts, other than lots or blocks, by special ordinance, but they were outside the city limits." The map of the city being shown to witness, he said: "This map is the only one under which sales of lots and blocks were made. I never knew of any lots within the city limits sold that were not on this map. * * * Macdonnell's tract is not marked or laid off anywhere on this city map."

Another witness says: "I have lived in Laredo all my life; am in my fifty-fourth year; I first held office as procurador of this place under the Government of Mexico; I held this in 1842 or 1843. Under the American Government I have been chief justice of Webb county, alderman and mayor of Laredo. During the late war I was colonel in the Confederate army. No person has ever claimed exclusive ownership of the flats of the river. It has always been used as a landing and common highway for passengers and freight going and coming across the river. Until lately there have never been any lots sold below the bluffs. It was never heard of before, that any person ever thought of applying for purchase of lots or land lying down there."

There was no testimony in the case tending in the slightest degree to rebut or contradict the testimony of these witnesses.

But appellees insist, that although the sale to Macdonnell by the mayor may have been beyond the scope of his authority, it was subsequently ratified and confirmed by the city council, by the following resolution, passed December 27, 1875: "Be it resolved by the city council of the city of Laredo, That all acts, deeds, and contracts whatsoever, orders, obligations, contracts executed or to be executed, heretofore made and performed during the year 1875, by his honor the mayor, Refugio Benavides, on behalf and in the name of the city of Laredo, be, and the same are hereby, approved, confirmed, and ratified

by the city council of the city of Laredo." Certainly, this resolution is sufficiently broad and comprehensive in its terms to confirm this or any other act done by the mayor on behalf or in the name of the city in the course of said year which it was in the power of the council to confirm, if the facts and circumstances attending its adoption were such as to warrant this resolution being held applicable to it.

But was this the case in relation to the execution of this deed to Macdonnell?

The evidence warrants the conclusion that the procuring of the deed was a part of a secret and premeditated scheme by the parties engaged in it to secure for themselves the ferry franchise across the Rio Grande River opposite the city of Laredo, which was then claimed and exercised by the city. The first step in the accomplishment of this design was the secret organization of the ferry company and procuring a deed from the mayor so general and indefinite in its terms as to enable the grantee to claim the rights of a riparian owner. To this end, the land purchased is described in the deed as "ten lots, number ——, block number ——, on the east bank of the Rio Grande River, with a front on said river commencing at a lot or parcel of land on said bank owned by Santos and Cristobal Benavides." The bank here referred to is plainly shown to be the bluff which bounds the water of the river at its highest stage, because this is where the Benavides lot is situate. West of this lot there were surveyed lots and blocks which the mayor was authorized to sell; but if the land bought was to embrace the lots west of the Benavides lot, it should have been designated by the numbers of the lots and blocks as they are upon the city map, but the numbers are left blank. The figure "10" is inserted before the word "lots," not to designate the locality of the land embraced in the deed, but to mislead the credulous and confiding mayor, and perhaps others, to suppose that the deed merely called for land which had been surveyed and placed on the city map, and which the mayor might sell. If the land purchased is located by course,

distance, and quantity as called for adjoining the Benavides lot, then it would not reach the river at its ordinary stage by more than a hundred varas. Therefore care was taken to add to this description of it, in the deed, the words "and running up said river with its meanders for quantity." Evidently the parties engaged in this scheme were too astute not to know that the validity of this deed would be questioned so soon as their object and purpose became public. The evidence in the record shows that they most sedulously guarded their secret until some time subsequent to the passage by the city council of the resolution which appellees rely upon as a confirmation of this unauthorized and invalid deed by the mayor. This fact, with others developed in the progress of this case, may well excite suspicion that it was but a part of the original arrangement of securing for parties interested in getting the deed to Macdonnell the coveted prize for which they were plotting, to avail themselves of the kindly feeling generally entertained for a popular officer, and under the guise of a complimentary expression of confidence and approval of his official conduct, by the adoption of this resolution, to procure from the city council, as they supposed, a ratification of an unauthorized and invalid act.

But if such was its purpose, the parties engaged in it overlooked the fact that ratification, even as between individuals in regard to private transactions, is not obligatory unless the act relied upon is done with full knowledge of the facts and circumstances of the case. (Story on Sales, 77; 18 Md., 282; 8 Wall., 26.) And it has been more than once seriously doubted, if not denied, that a city council has authority to validate by ratification an illegal act or contract of another municipal authority. (4 E. D. Smith, 413; 2 Kan., 371.)

It is also contended that the deed was ratified by the city council by resolution passed at a called meeting to consider a petition to this effect by the grantee, Macdonnell, on April 14, 1877, while this case was on trial before the District Court. The circumstances under which this meeting of the council

was had, and its attendant surroundings, are well calculated to occasion grave comment. It will suffice, however, to say, whatever may have been the intention of the council or those at whose instance — to use no stronger term — it was passed, that this resolution does not undertake or purport to validate or confirm the deed in question. It merely says "that it is the opinion of this corporation that the intent of the parties to said deed was to convey ten lots on said river front, in accordance with the survey, and now attached to the deed executed by the city and delivered to J. H. McComb,"—that is, that the council believed it was the intention of the parties to the deed to convey land where appellees had, subsequent to the date, caused it to be surveyed, which, as we have said, was a part of the flats, and which was not adjoining or contiguous to the Benavides lot called for in the deed, and which had not been laid off into lots and blocks on the city map previous to its sale. If the council were right in their opinion, it only shows that the mayor was knowingly a party to an attempt to violate the charter of the city and convey property belonging to it without authority; but it does not show that the council intended to ratify, or supposed it had ratified or confirmed, his unauthorized act.

It follows from what has been said that the judgment in favor of appellees is erroneous and must be reversed, and judgment here rendered for appellant in accordance with the prayer of the petition. It is so ordered.

REVERSED AND RENDERED.

[Opinion delivered February 13, 1880.]