**Reversed and Rendered and Memorandum Opinion filed July 26, 2012.**



In The

# Fourteenth Court of Appeals

———————————

### NO. 14-11-00510-CV

———————————

### PEEK/HOWE REAL ESTATE, INC., Appellant

### V.

### BROWN & GAY ENGINEERS, INC., Appellee

**On Appeal from the County Civil Court at Law No. 4**
**Harris County, Texas**
**Trial Court Cause No. 929,151**

## MEMORANDUM OPINION

In this breach-of-contract case, Peek/Howe Real Estate, Inc. challenges the judgment against it on the grounds, *inter alia*, that there is no evidence that the person who signed the contract had actual or apparent authority to act on its behalf, and no evidence that it ratified the contract. We agree. We accordingly reverse the trial court's judgment and render judgment that Brown & Gay take nothing.

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns three companies that are among a group of twenty-five or thirty companies informally referred to in the collective as "Peek-Howe." Each company is

involved in some way in the acquisition, development, sale, or management of real property. MMAR Holdings, LLC develops real property before each property is transferred to a single-purpose corporation. PHL Construction, LLC builds an apartment complex on the site, and when construction is completed, the apartment complex may be sold, or it may be managed by Peek/Howe Real Estate, Inc. (which, to prevent confusion, we refer to as "the Management Company"). The first two companies, MMAR Holdings, LLC and PHL Construction, LLC, are owned by Robert S. Peek, Jr., Lacy Howe, and Art Lancaster. The Management Company is owned only by Peek and Howe. All of the companies—MMAR Holdings, LLC, PHL Construction, LLC, the Management Company, and the many single-purpose corporations—share the same Baton Rouge, Louisiana address, telephone number, and post-office box. All of the companies' employees have email addresses ending in "@peek-howe.com" and are paid by the Management Company, which then bills and is reimbursed by the company for whom the work was performed. For example, Bob Cabell was an employee of the Management Company, but the company billed and was reimbursed by PHL Construction, LLC for his time.

As relevant here, Art Lancaster told Robert Peek about the potential development of the site referred to in the record as "the Copperfield tract." Lancaster was in charge of obtaining financing for the project and was the manager of PHL Construction. Below him, Bob Cabell "ran the operations of PHL Construction," which included evaluating the feasibility of the site.

Cabell told Ronnie Harris of Brown & Gay Engineers, Inc. that he would like that company to perform the civil engineering work for an apartment-development project. The engineering company would perform some of the due-diligence work associated with the project, identify and arrange for utilities service, and prepare the plans for water drainage and for connecting the site to utilities. These engineering services would be

2

essential to the ultimate acquisition of the site. According to Harris, Cabell said he "worked for a company called Peek-Howe." Harris prepared and emailed the contract to Cabell. Above the space for Cabell's signature Harris had placed the words, "ACCEPTED" and "Peek-Howe." Cabell's title was not indicated. Cabell signed the contract and faxed it back to Brown & Gay. The fax was accompanied by a cover sheet with the heading, "Peek-Howe Real Estate" and in a different font, the typed closing, "Thank You, Bob Cabell, Peek-Howe Real Estate." Robert Peek testified that the "Peek-Howe Real Estate" identified on the fax cover sheet's letterhead is Peek/Howe Real Estate, Inc. The post-office box, telephone number, and fax number on the fax cover sheet are the same numbers shared by the Management Company, MMAR Holdings, LLC, and PHL Construction, LLC. There is no evidence that anyone ever informed Brown & Gay that "Peek-Howe" was used to refer to more than one company, or to a company with a different name.

Brown & Gay addressed the invoices for its work to "Peek-Howe" at the Baton Rouge address, but received only one payment for $1,830.00, which was paid in June 2008 to reimburse Brown & Gay for fees paid to the City of Houston when the plat for the project was filed. The payment was made by a check from MMAR Holdings, LLC and signed by Robert Peek, who also is the president of the Management Company. As Peek later testified, he did not prepare the check or know what it was for. The following month, another Brown & Gay employee contacted Cabell's co-worker Vyron Bernard and asked Bernard to "provide the signature block for the entity that will be signing the plat." In response, Bernard emailed Brown & Gay a title commitment for the site and stated, "Although the commitment lists the proposed insured as MMAR Holdings, LLC, an entity 'Smithstone Reserve, LLC' is currently being set up to actually purchase the property. Therefore, the title block should be set up for the new entity to be signed by Arthur A.

3

Lancaster, Member."[1]  Later that month, a Dallas architect sent Brown & Gay a schematic design of the apartment complex planned for the site.  The schematic was labeled, "Peek-Howe Real Estate."  A few weeks later, however, Cabell told Brown & Gay to stop work on the project.

In October 2008, Brown & Gay began taking legal steps to collect its unpaid fees. The engineering company's attorney researched "Peek-Howe" with the secretary of state's office and learned what appeared to be the full name of the company, Peek/Howe Real Estate, Inc.  The attorney sent a demand letter to the Management Company, directed to the attention of Robert Peek and Bob Cabell.  Peek testified that he gave the letter to Art Lancaster.  About a month later, Lancaster called Brown & Gay, and as Harris later related, Lancaster said "it is their intent not only to pay us in full, but to also build the project and continue development of other projects."  No further payments were made. Although MMAR Holdings had planned to acquire the Copperfield tract, it ultimately was unable to obtain financing and did not purchase the site.  Peek testified that in the past, MMAR Holdings "would do the feasibility and pay the feasibility costs, whether the project made or did not make."  It did not do so in this instance because the company "has no money."

Brown & Gay sued MMAR Holdings and the Management Company, and the case was tried without a jury.  By this time, both of the defendant companies effectively were out of business.  At trial, Peek testified that Cabell had no authority to enter into contracts on behalf of the Management Company.  Peek stated that he was unaware that Cabell had

---

[1] Both Lancaster and Bernard apparently were employed by the Management Company, but the record does not clearly identify the extent to which their work in connection with the Copperfield tract was performed on behalf of other companies.  For example, Peek agreed that Bernard was "also one of the employees who was subject to reimbursement," but did not say whether the company to be reimbursed was PHL Construction or MMAR Holdings.  Neither Bernard nor Lancaster is listed on any of PHL Construction's invoices for payroll reimbursement, and invoices from MMAR Holdings were not introduced at trial.

4

signed the agreement with Brown & Gay; that he, Peek, never indicated to Brown & Gay that Cabell was authorized to do so; and that he was aware of no activity by Lacy Howe that would have given Brown & Gay the idea that Cabell had such authority. Regarding Lancaster's statement to Harris that Brown & Gay's outstanding invoices would be paid, Peek stated that Lancaster had no authority to bind the Management Company to pay any bills.

The trial court rendered judgment against the Management Company for $62,495.25 in actual damages, together with attorney's fees, interest, and costs.[2] The parties filed proposed findings of fact and conclusions of law at the trial court's request, but the court ultimately issued no findings.

## II. ANALYSIS

Although the Management Company presents four issues for our review, two issues are dispositive. We therefore address only the issues in which the Management Company (a) challenges the legal sufficiency of the evidence supporting the trial court's implied finding that Cabell had actual or apparent authority to bind the Management Company to a contract with Brown & Gay, and (b) argues that there also is no evidence to support the alternative implied finding that even if Cabell had no such authority, the Management Company ratified the contract.

### A. Standard of Review

If a case is tried without a jury and the trial court issues no findings of fact and conclusions of law, then all findings of fact that are necessary to support the judgment and

---

[2] In her opening statement, counsel for the Management Company stated that Brown & Gay had been offered an agreed judgment against MMAR Holdings. Brown & Gay declined the offer, and although MMAR Holdings was a defendant in the case, no judgment, agreed or otherwise, was rendered against it.

that are supported by the record are implied. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992). Where, as here, a complete record is brought forward on appeal, these implied findings may be challenged for legal and factual sufficiency. *Id.* at 84. The same legal-sufficiency standard of review applies to findings by a trial court and findings by a jury. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). In evaluating legal sufficiency, we credit evidence that supports the judgment if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). A party attacking the legal sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof must demonstrate on appeal that no evidence supports the finding. *Hartis v. Century Furniture Indus., Inc.*, 230 S.W.3d 723, 734 (Tex. App.—Houston [14th Dist.] 2007, no pet.). And here, we agree with the Management Company that there is no evidence that Bob Cabell had actual or apparent authority to bind it to a contract with Brown & Gay, or that the Management Company ratified the contract.

## B. No Evidence of Actual or Apparent Authority

Actual authority usually denotes the authority a principal (1) intentionally confers upon an agent, (2) intentionally allows the agent to believe he possesses, or (3) by want of due care allows the agent to believe he possesses. *2616 S. Loop L.L.C. v. Health Source Home Care, Inc.*, 201 S.W.3d 349, 356–57 (Tex. App.—Houston [14th Dist.] 2006, no pet.). Such actual authority may be express or implied, *id.*, but no evidence of either express or implied authority was presented in this case. It is undisputed that the Management Company did not authorize Cabell to execute contracts on its behalf, and no evidence was presented that the Management Company intentionally allowed Cabell to believe he possessed such authority. Instead, Brown & Gay argued, both at trial and on appeal, that it relied on Cabell's apparent authority to act on the Management Company's behalf.

6

To establish liability based on an actor's apparent authority to bind another, the claimant must present evidence not only that it reasonably believed the actor had such authority, but also that this belief was generated by the putative principal's conduct. *Id.* Stated differently, "[t]he principal must have affirmatively held out the agent as possessing the authority or must have knowingly and voluntarily permitted the agent to act in an unauthorized manner." *NationsBank, N.A. v. Dilling*, 922 S.W.2d 950, 953 (Tex. 1996) (per curiam). Consequently, when determining whether the principal has created the appearance of an agency relationship, we can limit our review to consideration of conduct by the principal. *See First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 471 (Tex. 2004) (explaining that "apparent authority must be based on the acts of the principal" and "is limited to the scope of responsibility that is apparently authorized"). *See also Gaines v. Kelly*, 235 S.W.3d 179, 183–84 (Tex. 2007) ("Declarations of the alleged agent, without more, are incompetent to establish either the existence of the alleged agency or the scope of the alleged agent's authority." (citing *Sw. Title Ins. Co. v. Northland Bldg. Corp.*, 552 S.W.2d 425, 428 (Tex. 1977))).

Here, the evidence concerning the Management Company's conduct shows only that the company employed and paid Cabell, and that it was one of 25–30 companies that shared a common address, post-office box, telephone number, and email address. This evidence is insufficient to show that the Management Company caused Brown & Gay to form a reasonable belief that Cabell was authorized to execute a contract on its behalf. The fact that Cabell was employed by the Management Company in a capacity undisclosed to Brown & Gay does not indicate that he was authorized to bind the company. *See Rourke v. Garza*, 530 S.W.2d 794, 803–04 (Tex. 1975) (no evidence that general superintendant of all company's jobsites in the Galveston area was authorized to bind his employer to an indemnification agreement), *abrogated on other grounds by Ford Motor Co. v. Ledesma*, 242 S.W.3d 32 (Tex. 2007). In some circumstances, appointing a person to a particular position can be evidence that the person has authority over "those things

ordinarily entrusted to one occupying such a position." *Id.* Here, however, there is evidence that Cabell was in charge of PHL Construction's operations, but no evidence that Cabell held any recognized position or title in the Management Company. It is true that Cabell could be reached by mail or phone at the same location where the Management Company has its offices; had access to the company's fax cover sheets; and used "peek-howe" in his email address. But, these facts are true of all of the Management Company's employees, and do not show that any particular employee was authorized to negotiate contracts on the company's behalf. *Cf. Ames v. Great S. Bank*, 672 S.W.2d 447, 450 (Tex. 1984) (holding that bank could not reasonably have believed that a bookkeeper who was authorized to sign checks from corporate account of "Nancy Ames Productions" had similar authority over Nancy Ames's personal accounts). We therefore agree with the Management Company that there is no evidence that Cabell had actual or apparent authority to execute a contract in its name.

## C.      No Evidence of Ratification

As an alternative basis for liability, Brown & Gay alleged that the Management Company ratified the contract Cabell executed. As we recently pointed out, "[i]n a practical sense, . . . there is no difference between prior authorization and subsequent ratification." *Harris Cnty. v. Nagel*, 349 S.W.3d 769, 788 (Tex. App.—Houston [14th Dist.] 2011, pet. filed). *See also* RESTATEMENT (THIRD) OF AGENCY § 4.01(1) (2006) ("Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority."); RESTATEMENT (SECOND) OF AGENCY, § 82 (1958) ("Ratification is the affirmance by a person of a prior act which did not bind him but which was done or professedly done on his account, whereby the act, as to some or all persons, is given effect as if originally authorized by him."). On this record, however, we agree with the Management Company that there is no evidence of ratification.

8

Although Brown & Gay alleged in its pleadings that the Management Company ratified the contract Cabell signed, Brown & Gay did not state whether the alleged ratification was express or implied. *See Petroleum Anchor Equip., Inc. v. Tyra*, 419 S.W.2d 829, 834 (Tex. 1967) (recognizing both types of ratification). When an agent enters into a contract in the principal's name, the principal can expressly ratify its agent's conduct by agreeing to be bound by contract, or it can impliedly ratify the contract by retaining the benefits of the agreement. *Willis v. Donnelly*, 199 S.W.3d 262, 270 (Tex. 2006). The critical factors in determining whether a principal has ratified an unauthorized act by his agent are the principal's knowledge of the transaction and its actions in light of such knowledge. *Land Title Co. of Dallas, Inc. v. F. M. Stigler, Inc.*, 609 S.W.2d 754, 756 (Tex. 1980) (citing *City of Laredo v. Macdonnell*, 52 Tex. 511, 528 (1880)).

On appeal, Brown & Gay asserts that the Management Company ratified the agreement executed by Cabell because it "recognized the validity of the contract by acting under the contract, performing under the contract, or affirmatively acknowledging the contract and retain[ing] the benefits of the engineering services . . . after [the Management Company] acquired full knowledge of the conduct" of Cabell, Lancaster, and Bernard. We have reviewed the record in the light most favorable to the judgment and have found no evidence that the Management Company knew that Cabell executed a contract in its name, or that it acknowledged, performed under, or retained the benefits of that contract. *See BancTEXAS Allen Parkway v. Allied Am. Bank*, 694 S.W.2d 179, 181 (Tex. App.—Houston [14th Dist.] 1985, no writ) (holding that one asserting implied ratification of a contract must show that the principal knew that the contract was entered in its name). The only evidence that Brown & Gay has identified in support of this position is a check it received from Cabell. The check was drawn on the account of MMAR Holdings, LLC and signed by Robert Peek. Peek is both a member of MMAR Holdings and the president of the Management Company, and he is authorized to sign checks on behalf of either organization. But, the Management Company is a legal entity separate and distinct both

9

from MMAR Holdings and from the individuals who have an ownership interest in either company. *See Singh v. Duane Morris, L.L.P.*, 338 S.W.3d 176, 181–82 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) ("A corporation is a separate legal entity from its shareholders, officers, and directors."); *Cotton v. Weatherford Bancshares, Inc.*, 187 S.W.3d 687, 699 (Tex. App.—Fort Worth 2006, pet. denied) ("Corporations are separate legal entities . . . ."). Consequently, neither MMAR Holdings's payment to Brown & Gay nor Peek's conduct in signing MMAR Holdings's check constitutes an act attributable to the Management Company.[3]

We also have found no evidence that the Management Company affirmatively acknowledged the contract as binding upon it or otherwise expressly ratified the contract. There is evidence that Brown & Gay sent a demand letter addressed to Peek/Howe Real Estate, Inc. and directed it to the attention of both "Robert S. Peek, Jr., President" and Bob Cabell, but the letter contains no mention of the contract, and there is no evidence that anyone with ratification authority was informed that Cabell had purported to sign a contract on behalf of "Peek-Howe." Robert Peek testified that although he spoke with Lancaster about the demand letter, Peek did not tell Lancaster that the Management Company intended to pay Brown & Gay's bill. Peek further stated that Lancaster was not authorized to bind the Management Company and that when Lancaster telephoned Brown & Gay about the bill, he did so without Peek's knowledge. Although we presume that the trial court did not find this testimony credible, the trial court's disbelief of this evidence is no evidence that the opposite is true. *Tex. & N. O. R. Co. v. Grace*, 144 Tex. 71, 75, 188 S.W.2d 378, 380 (1945); *Castillo v. Neely's TBA Dealer Supply*, 776 S.W.2d 290, 295 (Tex. App.—Houston [1st Dist.] 1989, writ denied); *see also Browning-Ferris, Inc. v. Reyna*, 865 S.W.2d 925, 927 (Tex. 1993) ("[S]ome suspicion linked to other suspicion

---

[3] The absence of a judgment against MMAR Holdings has not been challenged on appeal; thus, we are not presented with a question as to whether the trial court erred in impliedly failing to find that MMAR Holdings ratified the contract.

produces only more suspicion, which is not the same as some evidence."). The record contains some evidence that Lancaster lacked authority to bind the Management Company, but no evidence that he possessed such authority.

Because there is no evidence the Management Company knew that Cabell executed a contract in its name and no evidence that it agreed to be bound by the contract, performed under the contract, or retained any benefit from Brown & Gay's services, the Management Company cannot be held liable for contract damages under a ratification theory. We therefore sustain the Management Company's challenge to the legal sufficiency of the evidence of ratification, and do not reach the remaining issues.

### III. CONCLUSION

To recover from the Management Company for breach of contract, Brown & Gay bore the burden at trial to produce legally sufficient evidence that (a) the person who purported to sign the contract on the Management Company's behalf had actual or apparent authority to do so; or (b) the Management Company learned that Cabell executed the contract in its name and expressly or impliedly ratified the contract. Because there is no evidence supporting either theory of liability, we reverse the trial court's judgment and render judgment that Brown & Gay take nothing by its claims.

Having disposed of the case on legal-sufficiency grounds, we do not address the remaining issues presented by the Management Company.

/s/    Tracy Christopher
       Justice

Panel consists of Justices Frost, Brown, and Christopher.

11