Revised July 23, 1999

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 98-50288
_____

50-OFF STORES, INC.,

                                        Plaintiff-Appellee,

VERSUS

BANQUES PARIBAS (SUISSE) S.A., ET AL,

                                        Defendants,

HOWARD WHITE,

                                        Third Party Plaintiff,

VERSUS

THE CHASE MANHATTAN BANK, N.A.,

           Defendant-Third Party Defendant-Appellant.

_____

Appeal from the United States District Court
For the Western District of Texas
_____
July 1, 1999

Before DAVIS, STEWART, and PARKER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

     Defendant-Appellant The Chase Manhattan Bank, N.A. ("Chase")
appeals a jury verdict in excess of $150 million in compensatory,
consequential, and punitive damages for the conversion of 1.5
million shares of stock of Plaintiff-Appellee 50-Off Stores, Inc.
("50-Off").  For the reasons that follow, we vacate the awards of
punitive damages and prejudgment interest and uphold the awards of

compensatory and consequential damages.

I.

We review the record, including factual and credibility determinations and the reasonable inferences that may be drawn therefrom, in the light most favorable to the verdict. <u>Denton v. Morgan</u>, 136 F.3d 1038, 1044 (5th Cir. 1998). When viewed in such a light, the central facts of this case are as follows.

Plaintiff-Appellee 50-Off operated a chain of discount retail stores headquartered in San Antonio, Texas.[1] In October 1994, 50-Off decided to raise money through a stock offering in order to purchase inventory for the Christmas shopping season. 50-Off engaged experienced professionals, including the investment banking firm of Jefferies & Co. ("Jefferies"), to help it orchestrate the stock offering. In order to avoid the regulatory rigors of a full-blown stock offering, 50-Off decided to issue stock through Regulation S, which excused it from many of the requirements of the Securities Act of 1933. The offering under Regulation S, however, had at least one major disadvantage: the stock being issued could only be sold to foreign investors for the first forty days after closing.

50-Off and its law firm Akin, Gump, Strauss, Hauer & Feld, along with Jefferies and its law firm Morgan, Lewis, and Bockius, prepared a form subscription agreement. This agreement required

---

[1] At least in part due to the events leading to this lawsuit, 50-Off filed for bankruptcy in October 1996. The company has since been reformed under the name LOT$OFF Corp.

payment on delivery and required that the stock bear a six-month restrictive legend. On November 8, 1994, using this form subscription agreement, 50-Off sold 310,000 shares of stock at $3.75 per share to Swiss and British investors.

Around this time, Howard White called Chris Jensen, an attorney for Jefferies. White stated that he was a lawyer who represented Banques Paribas (Suisse), S.A. ("BPS"), a major European bank.[2] He stated that BPS wished to purchase 1.5 million shares of 50-Off stock at $3.65 per share. He then introduced Jensen to three companies: Andalucian Villas (Forty-Eight), Ltd., Arnass, Ltd., and Brocimast Enterprises, Ltd. White indicated that these companies were owned by BPS, or at least closely affiliated with the bank. In reality, however, these three companies were offshore shell corporations of Yanni Koutsoubos, a BPS customer and, as 50-Off would later discover, an international white collar criminal.

White proposed subscription and escrow agreements more complex than those prepared by 50-Off, Jefferies, and their law firms. Under White's proposed agreements, the stock would be delivered to an escrow agent unpaid for and without a restrictive legend. The escrow agent was to deliver the stock to a bank for authentication in return for an "irrevocable bank payment guarantee." 50-Off understood that the bank would hold the stock until payment was received. Jensen and John Patrick Ryan, 50-Off's attorney,

---

[2] In reality, White is not a lawyer, nor was he ever affiliated with BPS.

3

determined that White's proposed agreements satisfied Regulation S and therefore agreed to them. Dennis Morris, a Canadian attorney, was selected as the escrow agent.

On November 9, 50-Off received the executed subscription and escrow agreements. The next day, 50-Off issued 1.5 million unlegended[3] shares in BPS's name and delivered these shares to Morris. Chase Account Administrator Miha Zajec instructed White on the procedure for delivering the securities to Chase. White passed these instructions on to Morris. Morris, in turn, instructed a courier, William Jackson, to deliver the shares to Chase. Morris provided a letter to accompany the deposit stating, "These shares have a debit balance due."

On November 14, BPS, a long-time Chase customer, instructed Chase, "Please accept free[4] for our account PS 97824 from Dennis S. Morris" the 1.5 million 50-Off shares. In sending this instruction, BPS was acting on behalf of its customer Koutsoubos.

Also on November 14, Jackson delivered the shares to Chase's physical receive window as per Morris's instructions. At the

---

[3] As noted above, shares issued under the original form agreement prepared by 50-Off and Jefferies bore a six-month restrictive legend, thus indicating that the stock came from this Regulation S offering and preventing free transferability. The 1.5 million shares for the sale to Koutsoubos were issued without a legend, making the shares harder to trace and at the same time not indicating to purchasers that the shares were restricted.

[4] One of Chase's expert witnesses, Walter Cushman, testified that custodial banks such as Chase receive stock for customers either "free" or versus payment. By instructing that the stock should be deposited "free," BPS was indicating that the stock was either fully paid for or that Chase would not be involved in the payment for the stock.

window, Jackson asked for Zajec, the Chase representative who had provided the delivery instructions. The employee at the window stepped away to call Zajec. The employee soon returned with Tony Dinalfo, another Chase employee, to whom Jackson pointed out the "debit balance due" language. At trial, Jackson testified,

> I showed them the fact that there was a debit balance, and that they should be aware of this because the stock is not paid for, and the bank is acting as a temporary custodian, intermediate to delivering these shares to the ultimate holder, and that they should get paid for these shares and pay us for them, or the Dennis Stephen Morris [firm] . . . . That this debit balance was a debt or a credit that they owed for the shares, and if they sent them onwards they should then get paid and transmit it back.

Dinalfo indicated that he understood, initialed parts of the delivery forms--including the statement that the shares had a "debit balance due"--and accepted possession of the stock. Dinalfo then placed an identification number known as a restrictive CUSIP on the shares, presumably to indicate that the stock had not been paid for. The same day, Chase sent Morris a receipt acknowledging the deposit of the stock. The receipt stated, "These shares have a debit balance due against them."

Thus, on November 14, 1.5 million unpaid-for and unlegended 50-Off shares, registered to BPS, were deposited at Chase. These shares were initially placed in a "holdover" account--an account used for, among other things, holding shares pending payment. At trial, Chase was unable to present the holdover account records for November 1994. Chase contended that these records had been destroyed, as is customary in the industry. Chase, however, was able to produce the holdover account records for October 1994.

5

Chase was also unable to produce a delivery ticket--the record made of every delivery of stock to Chase--for the November 14 deposit. According to one of Chase's witnesses, Frank DeCicco, delivery tickets indicate whether stock is delivered free or if payment is due. 50-Off argued that the missing delivery ticket was consistent with the receipt and indicated that a payment was due on the 50-Off stock.

As previously noted, on November 14, Chase's customer, BPS, sent a message stating the stock was "free" and yet the deposit information indicated that the stock had a debit balance due. Walter Cushman, one of Chase's expert witnesses, testified that when the delivery instructions and the customer's instructions are inconsistent, the stock is either held in a holdover account until the discrepancy is resolved or it is returned to the deliverer. Similarly, BPS Account Officer Ramys Molteni agreed that such a discrepancy should be corrected before the stock is deposited into the customer's account.

Chase, however, either did not notice this discrepancy or ignored it. BPS, presumably instructed by Koutsoubos, told Chase to deposit the 50-Off stock into BPS's account. Chase acted as instructed. 50-Off argued that when Chase deposited the stock "free" into BPS's account on November 18, 1994, Chase converted the stock.

The subscription agreement called for payment for the 1.5 million shares by November 25. The payment did not arrive as scheduled. 50-Off, believing that the shares were deposited in

6

Chase under Morris's control, still attempted to close the deal. On November 30, Koutsoubos indicated that payment for one million shares was being sent. On December 2, however, Koutsoubos complained that 50-Off should have disclosed their October sales figures to him and asked that the purchase price be lowered. On December 8 or 9, 50-Off lowered the price to $3.25 per share. On December 22, 50-Off further lowered the price to $2.66. On December 29, Koutsoubos explained that he would not be able to pay for the shares until January 3, 1995, because his bank officer was on vacation. On January 18, Koutsoubos stated that a representative of 50-Off should come to Lugano to get paid.

In the meantime, BPS authorized Chase to transfer the 50-Off shares into one of Chase's street names, Egger & Co ("Egger"). On January 19, Zajec transferred the shares. Upon learning that the shares had been reregistered into the Egger account, Ryan, 50-Off's counsel, contacted Joel Brimmer, a Security Control Analyst at Chase involved in the stock transfer. On January 26, Ryan told Brimmer that the shares had still not been paid for and asked why they had been reregistered. Brimmer indicated that he would contact the "appropriate" person. On January 27, Ryan faxed Brimmer and Morris a letter expressing concern and stating that the shares had not yet been paid for. In this letter, he referenced his conversation with Brimmer the previous day. This letter stated, among other things, that 50-Off would consider it improper "for [BPS] or any of its agents, including Chase or its affiliates, to transfer or otherwise deal with [the stock] . . . ." Brimmer

forwarded this letter to the relevant administrative department at Chase. No administrator looked at the letter until mid-February.

Pursuant to further instructions from BPS, on January 26, Chase transferred the 50-Off stock into its account at Depository Trust Co. ("DTC"), a clearinghouse for electronic transactions, and then into DTC's street name, Cede & Co. On January 27, BPS began to sell the stock. At this point, Koutsoubos was receiving money from the sale of stock for which he had never paid.

On February 15, Ryan wrote Brimmer again, complaining about the lack of response to his January 27 letter. By February 17, Zajec was given both of Ryan's letters and he quickly forwarded them to Chase's legal department. Lourdes Fidalgo, a Chase manager, compiled a report and referred the matter to Vice President and Senior Associate Counsel Lynne Barry, who brought in another Chase attorney, Barbara Barrantes, to investigate. Barrantes froze the 50-Off shares, but lifted the freeze after twenty-four hours. Barrantes testified that she lifted the freeze because she determined that, without court authority from a complaining party, Chase could not freeze the shares in BPS's account.

On February 28, Barrantes wrote a letter to BPS. In this letter, she expressed concern about the 50-Off transaction and another BPS transaction involving Interactive Network, Inc. ("INNN") stock.[5] She stated, "we must again remind you of your

_____

[5] The INNN transaction was another fraud scheme perpetrated by Koutsoubos.

8

obligation to indemnify Chase against all liability, loss and expense, including attorneys' fees, which we may incur in connection with your custody account or the custody agreement."

On February 21, 50-Off filed this suit. The original defendants were BPS, Howard White, Dennis Morris, Morris & Associates, Yanni Koutsoubos, Arnass, Ltd., Brocimast Enterprises, Ltd., Andalucian Villas (Forty-Eight), Ltd., and Betafid, S.A. 50-Off alleged that the Defendants had stolen its stock, converted its stock, breached the subscription agreements and the escrow agreement, and committed securities fraud.

On March 3, Barrantes spoke with Ryan, apparently for the first time. She indicated that she could not reveal any information without a subpoena. On this date, there were still 507,000 50-Off shares remaining to be sold. Barrantes did not reveal that shares were being sold and it is not clear whether 50-Off was aware that the unpaid-for shares were being sold or, alternatively, that there were any shares that had not been sold. Within a few more business days, the remaining half-million 50-Off shares were transferred out of Chase's control under BPS's instructions. 50-Off received no money for any of the 1.5 million shares.

In December 1996, 50-Off joined Chase as a Defendant to this lawsuit. 50-Off alleged that Chase had illegally converted the 1.5 million shares. 50-Off also alleged that Chase had aided and abetted the other Defendants in violating the Texas Securities Act. This second count against Chase was dismissed by the district

9

court.

BPS appeared and participated in the trial. However, near the end of the trial, BPS settled for $2.4 million. Morris appeared and testified, but then disappeared. 50-Off did not pursue its claims against Morris. Neither White, nor Koutsoubos, nor any of their companies appeared.[6] During trial, the district court entered a $30 million default judgment against Koutsoubos. After trial, the district court entered default judgments for $10.575 million for compensatory damages plus $25.95 million each in punitive damages against Koutsoubos's shell companies, White, Aries Peak, and Betafid. The district court found that each had maliciously committed securities fraud.

After the presentation of evidence, Chase moved for a directed verdict on the grounds that 50-Off's conversion claim was deficient as a matter of law. The district court denied this motion and the case went to the jury on a single liability theory--whether Chase had converted 50-Off's stock. The jury found that Chase had indeed converted the stock and awarded 50-Off $5.475 million ($3.65 per share for 1.5 million shares) in compensatory damages, $7.5 million in consequential damages, and $138 million in punitive damages. The district court credited BPS's $2.4 million settlement against this award and entered a judgment in favor of 50-Off for $148.575 million.

The district court denied Chase's motions to set aside the

---

[6] White's company Aries Peak had been joined in December 1996.

10

verdict, for a new trial, for remittitur, and for other post-judgment relief.  The district court also denied Chase's request to reduce the damage award by $4.3 million--the amount Jefferies, 50-Off's investment bank, paid 50-Off in a settlement.[7]  Chase now appeals.

## II.

Chase first argues that, as a matter of law, 50-Off did not establish conversion because 50-Off did not hold title to or possess the shares on the date of the alleged conversion.  Chase also argues that 50-Off's conversion claim must fail as a matter of law because 50-Off suffered no actual damages from the alleged conversion.

### A.

Under Texas law, "the tort of conversion is defined as the unauthorized and wrongful assumption and exercise of dominion and control over the property of another, to the exclusion of and inconsistent with the owner's rights."  Crutcher v. Continental Nat'l Bank, 884 S.W.2d 884, 888 (Tex. App. 1994, writ denied).  Chase relies on the well-established rule that a plaintiff seeking to establish conversion must prove title, possession, or the immediate right to possession of the property at the time of the alleged conversion.  See Lone Star Beer, Inc. v. Republic Nat'l Bank of Dallas, 508 S.W.2d 686, 687 (Tex. Civ. App. 1974, no writ).

Chase argues that when 50-Off sent the shares to Dennis Morris

---

[7]  Chase does not challenge this ruling on appeal.

11

on November 14, 1994, the company voluntarily relinquished to Morris all rights to its shares. For legal support, Chase relies on Texas Business and Commerce Code § 8.313(a)(1) (West 1991), which provides that certificated securities, such as those under consideration in this case, are transferred to a purchaser at "the time he or a person designated by him acquires possession" of them.[8] Chase contends that because Dennis Morris was a "person designated by [the purchaser]," and 50-Off voluntarily gave its shares to Morris, 50-Off did not hold any rights to possession or ownership when Chase allegedly converted the stock on November 18. In response, 50-Off argues that Morris, the escrow agent, was designated by it and not by the purchasers so that 50-Off maintained rights of possession over the stock--through Morris-- until November 18.

Consistent with Texas law, the district court instructed the jury that "[i]n a claim for conversion, a plaintiff must show [] that (1) the defendant wrongfully exercised dominion or control over the property to the exclusion of, or inconsistent with the plaintiff's rights of possession . . . ." Therefore, when the jury concluded that Chase converted the stock, it implicitly found that 50-Off--through its escrow agent Morris--retained rights of possession over the 1.5 million shares until November 18.

---

[8] Also relevant is Section 8.301 of the Texas Business and Commerce Code, which provides: "(a) Upon transfer of a security to a purchaser (Section 8.313), the purchaser acquires the rights in the security which his transferor had or had actual authority to convey unless the purchaser's rights are limited by Section 8.302(d)."

12

After reviewing the record, we find sufficient support--through, among other things, the escrow agreement and Morris's testimony--for this implicit jury finding. Moreover, as 50-Off points out, Chase did not advocate this "purchasers' designee" theory before the jury. For example, in its closing argument, Chase barely mentions Morris, stating only, "Dennis Morris, the escrow agent . . . was the one whose job it was to take this stock, take the money, and get the exchange made. Mr. Morris testified that that was his job. There's a contract that spells out that that was his job . . . , the escrow agreement." If anything, Chase's own closing argument treats Morris as 50-Off's agent, and not as the purchasers' designee.

In light of the jury's implicit finding that 50-Off--through Morris--retained rights to possession of the stock and the support for that finding within the record, we reject Chase's contention that as a matter of law no conversion took place on November 18.[9]

B.

---

[9] The facts in this case are different from those in a typical conversion case, in which the tortfeasor takes possession of the converted property. Here, Chase committed certain errors that helped thieves steal 50-Off's stock. Although this factual scenario is atypical, it still satisfies the elements of the tort and Chase does not argue to the contrary. See, e.g., Restatement of Torts (Second) § 222 (1965) ("If the dispossession seriously interferes with the right of the other to control the chattel, the actor may also be subject to liability for conversion."); D & G Equip. Co., Inc. v. First Nat'l Bank of Greencastle, 764 F.2d 950, 955-58 (3d Cir. 1985) (bank liable for conversion, under the UCC, when it permitted unauthorized former corporate executive to deposit and disburse corporate funds to his personal account); Sherrill White Constr. Co. v. South Carolina Nat'l Bank, 713 F.2d 1047, 1049-51 (4th Cir. 1983) (bank liable for conversion when it accepted and cashed unauthorized checks from corporation).

13

Chase next argues that it cannot be held liable for conversion because 50-Off suffered no actual damages. Chase also contends that if 50-Off did suffer actual damages, these damages were not a result of Chase's actions. We reject both of Chase's arguments.

Damages are an element of a conversion claim under Texas law. See Reed v. White, Weld & Co., Inc., 571 S.W.2d 395, 397-98 (Tex. Civ. App. 1978, no writ). Conversion damages "are limited to the amount necessary to compensate the plaintiff for the actual losses or injuries sustained as a natural and proximate result of the defendant's conversion." United Mobile Networks, L.P. v. Deaton, 939 S.W.2d 146, 148 (Tex. 1997). The proper measure of damages for conversion is generally the fair market value of the converted material on the date that it was converted, plus any other losses suffered as a natural and proximate cause of the conversion. See id.; Quest Medical, Inc. v. Apprill, 90 F.3d 1080, 1086 & n.6 (5th Cir. 1996). In this case, the judge instructed the jury that, if they found that Chase had converted the stock, they "may award 50-Off Stores the fair market value of the stock on the day and at the place it was converted and any other losses or expenses which were a natural and proximate cause of the conversion." Chase did not challenge the correctness of the jury charge on this issue and does not do so here. Our question, then, is whether the evidence is sufficient to support the jury's award based on these instructions.

Chase argues that because the purchasers were thieves and never intended to pay for the stock, 50-Off did not show that Chase's actions caused 50-Off any loss. In support of its

14

argument, Chase relies primarily on Deaton, 939 S.W.2d at 148-49. In Deaton, the defendant had converted the plaintiff's customer list by illegally copying the list. The plaintiff sought damages equal to the list's value, basing this valuation on the income the list had generated. The Supreme Court of Texas held that the plaintiff failed to prove damages because it provided no proof that the defendant's conversion lowered the value of the plaintiff's customer list. Id. Deaton, however, is inapposite to the case at hand. In Deaton, the court found no proof of damages because the plaintiff never lost its customer list. The defendant converted the list by reproducing it, not by taking the only available copy of the list. The plaintiff submitted no evidence that the value of its original list had been lowered by the defendant's conversion. Id. Here, Chase did not copy or otherwise duplicate the stock. Instead, Chase moved the actual 1.5 million shares into BPS's account before 50-Off or Morris received any payment for the shares. While Chase is correct that Deaton stands for the proposition that a conversion plaintiff must prove that the loss of the converted material caused the damages claimed, Deaton has no further application to the facts of this case.

In this case, according to Chase's own expert's testimony, if Chase had noticed the conflict between the delivery ticket and the customer's order, the stock would have been returned to the issuer, 50-Off, or at least held by Chase until it was determined whether money was owed on the stock. If Chase had acted in this manner, the 1.5 million shares would have been returned to 50-Off, if not

15

in late November, then at some later time.  50-Off could have then found new purchasers for the stock.  It is the proceeds from this later sale--actual damages--that Chase's conversion prevented 50-Off from realizing.[10]  Or, more simply put, the shares had value when they were deposited at Chase.  When Chase converted the stock, it took this value from 50-Off.  Chase's conversion was thus a cause of 50-Off's damages.

### C.

We turn next to the propriety of the compensatory damage award.  This issue turns on whether the record supports the award.

When we divide the compensatory damage award of $5.475 million by the numbers of shares converted--1.5 million--it is clear that the jury found that each share had a fair market value of $3.65.  Fair market value is the price that a willing purchaser would pay for the stock and the price that would cause a willing seller to part with the stock, when such a sale is an arms-length transaction.  See, e.g., Quest Medical, 90 F.3d at 1086.  Because

---

[10]  Chase states that "50-Off's sole damage theory posited that the thieves would have paid the purchase price absent the alleged conversion . . . ."  The record, however, does not support Chase's characterization of 50-Off's argument.  50-Off presented evidence that if Chase had acted correctly, the stock would have been returned to 50-Off.  During its closing argument, 50-Off stated that if Chase had "followed that agreement [made at the deposit window] this stock never would have gotten into the hands of the thieves."  50-Off is therefore not limiting its claim to one that the thieves would have paid for the stock.  At most, 50-Off argues that, absent Chase's conversion, either Koutsoubos would have paid for the stock (which he did in some of his previous stock purchases) or the stock would have been returned to 50-Off.  In either case, whether Koutsoubos intended to pay for the stock or not does not alter the basic fact that the stock had value when Chase converted it.

16

Koutsoubos probably never intended to pay the price he negotiated for the stock, the stock price that Koutsoubos agreed upon with 50-Off is not a useful indication of fair market value. It only shows what price 50-Off would accept, not the price an arms-length purchaser would pay.

The price Koutsoubos agreed to pay, however, was not the only evidence of the stock's value. 50-Off presented evidence that in the week prior to arranging the 1.5 million share sale to Koutsoubos, it sold 310,000 shares to European investors at $3.75 per share in an arms-length transaction. 50-Off also presented evidence that it had received an offer from another legitimate buyer for 190,000 shares at $3.65 per share.[11] In addition, the jury was told that on November 18, 1994, the date of the conversion, 50-Off shares were trading on the NASDAQ market at between $4.375 and $4.75 per share. Because shares from a Regulation S offering cannot be sold immediately to American investors, these shares sell for less than the unrestricted shares trading on markets such as the NASDAQ. The jury heard expert testimony indicating that a 20 percent discount for Regulation S shares was plausible. Thus, a fair market value of $3.65 per share in a Regulation S offering is reasonable for a stock trading on the NASDAQ exchange at between $4.375 and $4.75 per share. In sum, there is ample evidence to support the jury's finding that on November 18, 1994, the 50-Off stock had a fair market value of

_____

[11] This proposed sale was not completed on Koutsoubos's request.

17

$3.65 per share and that the conversion of the 1.5 million shares caused 50-Off to suffer a loss of $5.475 million.

### III.

Chase next challenges the jury award of $138 million in punitive damages. Because we agree with Chase that the evidence is insufficient to support an award of punitive damages in this case, we vacate the jury's punitive damage award.[12]

The court instructed the jury that it could award punitive damages if "the defendant acted with malice or willfulness or with callous and reckless indifference to the safety or rights of others." The court also instructed the jury that the defendant's behavior must be "shocking and offensive" before it could award punitive damages. Chase did not object to the district court's charge. We therefore review the record to determine whether the evidence is sufficient for the jury to determine that Chase's behavior was malicious or willful or made with callous and reckless

---

[12] Chase also contends that the district court's jury instructions for awarding punitive damages were incorrect. However, Chase failed to preserve this issue for appeal. We therefore do not consider this argument and assume without deciding that the jury instructions on punitive damages were correct as given.

50-Off argues that Chase also waived the issue of whether the evidence was sufficient to support an award of punitive damages by failing to include that issue within its motion for judgment as a matter of law. After reviewing the record, we conclude that Chase's objection to the jury charge on this issue--in which Chase argued that the evidence was insufficient to submit the question of punitive damages to the jury--was sufficient to preserve the error for appeal under Fed. R. Civ. P. 50. See, e.g., Scottish Heritable Trust, P.L.C. v. Peat Marwick Main & Co., 81 F.3d 606, 610-11 (5th Cir. 1996); Polanco v. City of Austin, Texas, 78 F.3d 968, 973-75 (5th Cir. 1993).

indifference so as to warrant a punitive damage award.  After a careful review of the record, we conclude that no matter how 50-Off attempts to massage the facts, Chase did not act in a manner justifying an award of punitive damages.

A low-level Chase employee conducting high-volume business made an error that led to the unpaid-for 50-Off stock being deposited "free" into BPS's account.  As previously discussed, this error constituted conversion and rendered Chase liable for substantial damages.  However, despite 50-Off's claims to the contrary, it presented no evidence that Chase or any of its employees intended to illegally convert the stock or otherwise aid in Koutsoubos's criminal scheme.[13]

In addition to making the processing error constituting the conversion, Chase was slow to react to 50-Off's expressions of concern in January and February 1995.  50-Off contacted Chase and made the bank aware of possible problems with the 50-Off stock transaction.  Chase took weeks to follow up on these complaints and to ascertain what had taken place.  If Chase had reacted faster or more aggressively, Koutsoubos and his coconspirators might have been stopped before all the 50-Off stock was sold.  However, beyond these two points--the processing error and the delay--there is little support for the award of punitive damages, and this evidence

_____

[13]    Just because Chase possessed the intent required for conversion--that is, the intent to move the stock from the holdover account into BPS's account--does not mean that Chase possessed the sort of wrongful intent required for punitive damages under the jury instructions. See <u>Winkle Chevy-Olds-Pontiac, Inc. v. Condon</u>, 830 S.W.2d 740, 746 (Tex. App. 1992, writ dism'd).

19

alone is not sufficient to warrant an award of punitive damages.

50-Off places special emphasis on the fact that Chase had an indemnity provision with BPS. 50-Off notes that when it brought its concerns to Chase's attention, Chase reminded BPS that it expected to be indemnified for any losses or damages it suffered from following BPS's instructions. 50-Off contends that this evidence demonstrates that Chase was willing maliciously to ignore the rights of 50-Off or any other small company so long as such a request came from an important customer such as BPS.

50-Off, however, ignores a major point. BPS was a customer of Chase, and therefore Chase owed BPS important duties. See, e.g., King v. Crossland Sav. Bank, 111 F.3d 251, 259 (2d Cir. 1997) (bank owes duty of care to customer); Young v. U.S. Dep't of Justice, 882 F.2d 633, 643 & n.12 (2d Cir. 1989) (bank owes duty of confidentiality to customer). 50-Off, on the other hand, was not a Chase customer (at least in this matter) and thus Chase's duties to 50-Off were limited. See Renner v. Chase Manhattan Bank, 1999 WL 47239, *13 (S.D. N.Y. 1999); see also Guidry v. Bank of LaPlace, 740 F. Supp. 1208, 1218 (E.D. La. 1990), aff'd as modified, 954 F.2d 278, 286-87 (5th Cir. 1992); E.F. Hutton Mortgage Corp. v. Equitable Bank, N.A., 678 F. Supp. 567, 577-79 (D. Md. 1988). The only obligations Chase owed 50-Off evolved out of the events that took place at the deposit window. Far from Chase's loyalty to BPS being evidence of behavior deserving punishment, Chase might well have broken banking laws had it not protected BPS's confidences or had it released information without a subpoena or other court

20

authorization.  See, e.g., N.Y. Banking Law § 134(5).  Thus, it is not surprising that after becoming aware of possible problems with BPS's account, Chase reminded BPS that it expected to be indemnified for liabilities resulting from BPS's instructions. This evidence certainly does not support an inference that Chase acted maliciously toward 50-Off.

50-Off stresses a number of additional events, such as Chase's actions in the INNN stock fraud also committed by Koutsoubos, in an attempt to justify the award of punitive damages.  However, after considering the record in detail, we conclude that these events-- upon which 50-Off places considerable reliance--at most demonstrate errors in judgment and technical flaws in Chase's procedures that left them exposed to a cunning criminal such as Koutsoubos.  These events do not demonstrate the sort of maliciousness, willfulness, or reckless indifference that would support an award of punitive damages.

In sum, while Chase converted 50-Off's stock, the record evidence does not support an inference that Chase acted with such malice or reckless indifference as to justify an award of punitive damages.  For this reason, the district court should not have submitted the issue of punitive damages to the jury. We therefore vacate the award of punitive damages.

IV.

Chase next argues that the district court made a number of evidentiary errors that mandate reversal and retrial.  Chase contends that the district court should have admitted evidence and

21

instructed the jury on proportionate responsibility among the Defendants and on 50-Off's failure to mitigate, and should not have excluded the deposition testimony of Claude Battiaz, the BPS executive in charge of BPS's relationship with Chase. We turn now to those arguments.

A.

Chase challenges the district court's decision to exclude evidence of the Defendants' proportionate responsibility and its refusal to instruct the jury on this issue.[14] In response, 50-Off contends, first, that Chase waived this issue for appeal and, second, that the district court's ruling was correct.[15]

50-Off contends that Chase failed to identify the affirmative defense of proportionate responsibility as a contested issue of fact or law in the Pretrial Order and also failed to timely request an instruction or special interrogatory on the issue. 50-Off acknowledges that Chase submitted a proposed proportionate responsibility special interrogatory. However, 50-Off contends

---

[14] Chase requested that the jury be given a special interrogatory assigning responsibility for the conversion among BPS, Betafid, S.A., Yanni Koutsoubos, Andalucian Villas (Forty Eight) Ltd., Arnass Ltd., Brocimast Enterprises, Ltd., Dennis Morris, Howard White, Aries Peak, Inc., and The Chase Manhattan Bank. The district court rejected this proposed interrogatory without explanation.

[15] In its initial brief, Chase challenged the district court's exclusion of evidence of negligence by 50-Off, Akin, Gump, and Jefferies. 50-Off contended that Chase was procedurally barred from raising this issue on appeal. In footnote 27 of its reply brief, Chase concedes this point. In the text of the reply brief, Chase focuses solely on the alleged error concerning the responsibility of the other Defendants.

22

that because this interrogatory was submitted only after 50-Off had closed its case and after BPS had settled, it would have been "manifestly unjust" for the trial court to have allowed Chase to raise a new defense theory so late in the trial, citing <u>Flannery v. Carroll</u>, 676 F.2d 126, 130-31 (5th Cir. 1982) (plaintiff barred from raising claim not contained in pretrial order, except by having the district court approve a motion to amend the pretrial order).

Chase does not deny that it failed to raise the defense in the Pretrial Order. Rather, Chase contends that it did not waive the issue because it raised the defense of the Defendants' comparative responsibility in its answers and in a pretrial motion. Chase did raise the issues of comparative responsibility and comparative negligence in its answer, although it is not clear whether Chase was referring to the other Defendants or to 50-Off and its advisors. The motion Chase refers us to, however, focuses on the actions of 50-Off and its law firm and does not mention either comparative responsibility or comparative negligence in reference to the other Defendants' actions. Thus, Chase asks that we remand this case for a new trial because the district court rejected a requested jury interrogatory based on a defense that was not clearly raised in the Pretrial Order, in Chase's answers, or at trial until after 50-Off had rested its case. The district court did not abuse its discretion in refusing to give this issue to the jury under the circumstances and a remand for trial of this defense is not warranted. <u>See</u> Fed. R. Civ. P. 16.

23

Chase next contends that the district court erred in excluding evidence of 50-Off's failure to mitigate damages and in refusing to instruct the jury on mitigation. After reviewing the record, we find no error.

In Bank One, Texas, N.A. v. Taylor, 970 F.2d 16 (5th Cir. 1992), we set forth the predicate a litigant must establish in order to have the issue of mitigation presented to the jury. We stated: "One who claims a failure to mitigate damages has the burden to prove not only a lack of diligence on the part of [the] injured party, but also the amount by which damages were increased by such failure to mitigate." Id. at 29.

Chase contends that 50-Off could have taken two steps to reduce its damages. First, it argues that 50-Off could have sought a court order enjoining Chase from transferring the stock. Second, it argues that 50-Off could have diluted its total outstanding shares by issuing additional shares of stock and thereby reducing its loss from the converted shares.

Chase failed to cite to the district court or to this Court a single case in which a court has held that a litigant's failure to seek an injunction enjoining expected harmful conduct is required for that litigant to recover for its full damages.[16] As we stated

---

[16] Chase points to NY Banking Law § 134(5) in support of its argument that--absent a court order--New York law prohibited it from recognizing any claim adverse to its depositor to securities on deposit in the bank. Whatever effect is to be given to this statute, Chase did not argue this statute to the district court in support of its mitigation argument and cannot raise it for the

24

in Bank One: "an injured party is required to incur only slight expense and reasonable effort in mitigating his damages." 970 F.2d at 29 (internal quotation marks omitted). We are satisfied that neither of the actions Chase contends 50-Off should have taken meet this test. Also, the record is bare with respect to the extent of any savings 50-Off would have enjoyed if it had sought and obtained an injunction in late January or early February 1995, when 50-Off first became aware that the stock was at risk. For example, on February 15, 1995, approximately 900,000 shares of stock remained in Cede & Co., but the record does not establish the value of those remaining shares as of that date. Similarly, Chase proffered no evidence tending to show the extent of 50-Off's savings if it had diluted its stock.

Chase did not demonstrate that a legitimate jury question was presented from which a jury could have determined that 50-Off failed to mitigate its damages by not undertaking the actions described above. Because no genuine issue of fact was presented, the district court did not err in excluding the evidence and in refusing to instruct the jury on mitigation.

## C.

Chase next contends that the district court abused its discretion by excluding the deposition testimony of Claude Battiaz, a BPS executive in charge of that bank's relationship with Chase. The taking of Battiaz's deposition involved a complex and

first time on appeal.

25

disorganized stream of events, which included conflicts between Swiss and American civil procedure, confusion over the required oaths, and the presence of a translator for only half of the deposition. Considering this confusion and the incompleteness of Battiaz's deposition, we conclude that the district court did not abuse its discretion in excluding Battiaz's deposition testimony.

V.

Chase contends, and 50-Off concedes, that the award of prejudgment interest and the award of consequential damages are duplicative--both serve to compensate the plaintiff for the loss of use of the converted property. See Harris v. Christianson-Keithley Co., 303 S.W.2d 422, 427-28 (Tex. Civ. App. 1957, writ ref'd n.r.e.). Therefore, we vacate the award of prejudgment interest.

CONCLUSION

In this case, 50-Off, a discount retail store, sued to recover damages for losses it suffered as the victim of an international securities fraud. 50-Off was awarded substantial compensatory, consequential, and punitive damages against Chase, one of the banks through which the securities fraud was consummated. Although the jury was entitled to find that Chase converted 50-Off's stock, Chase did not act in such a manner as to justify an award of punitive damages. We therefore vacate that award. We also vacate the district court's award of prejudgment interest.

AFFIRMED in part, VACATED in part.