**Eugene Morris HARTIS Jr., Appellant**

v.

**CENTURY FURNITURE INDUSTRIES, INC.,**
**Appellee.**

No. 14–05–01099–CV.

Court of Appeals of Texas,
Houston (14th Dist.).

June 28, 2007.

Joseph A. McDermott III, Houston, for Appellant.

Charlene Cantrell Koonce, Dallas, Patrick Joseph Schurr, Frisco, for Appellee.

Panel consists of Chief Justice HEDGES and Justices HUDSON and GUZMAN.

## OPINION

EVA M. GUZMAN, Justice.

Appellant Eugene Morris Hartis, Jr. sold furniture on consignment for appellee, Century Furniture Industries, Inc. After Hartis repeatedly failed to remit payment to Century, the parties agreed that Century would pick up its consigned furniture and also furniture manufactured by third parties from Hartis's Houston warehouses and credit the value of the furniture to Hartis's outstanding indebtedness. After retrieving and reselling the furniture, Century brought suit on a sworn account, alleging that, after applying the credit to Hartis's account, an outstanding balance remained. As an affirmative defense and counterclaim, Hartis alleged that the transfer was performed subject to a new

contract under which Century agreed to pay the full price stated by Hartis for each item. The main dispute on appeal involves Hartis's contention that Century agreed to purchase each item of third-party furniture for the price stated by Hartis in a written document detailing his Houston inventory. After a trial to the bench, the trial court ruled in favor of Century. We affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### April 2002–February 2003

Appellant Eugene Hartis, Jr. was a manufacturer's representative for Century Furniture Industries, Inc. ("Century"). His company, Century Showrooms ("Showroom") maintained an open account with Century. Century consigned furniture to Showroom, and Showroom paid Century for the furniture after it was sold.[1]

Century's controller, Brandon Hucks, inventoried Showroom's three warehouses in April 2002 and discovered that, although Century had consigned furniture with a wholesale value of $454,930.89 to Showroom, Showroom had only $229,724.25 in consigned furniture in its possession. Hartis admitted that he had sold the missing furniture and had not remitted any of the proceeds to Century.[2]

In an effort to address the missing payments, Hartis executed a "Key Points of Agreement" ("Key Agreement") with Century on April 29, 2002. Under this Agreement, Hartis assumed personal responsibility for Showroom's debt (the "Note") and agreed to execute required forms perfecting Century's lien on "the existing inventory and inventory acquired in the future" as collateral securing the Note. He also agreed that, effective January 1, 2003, he would devote 85% of Showroom's net usable space to Century products. Century agreed to reduce the debt arising from the missing furniture from $225,206.64 to $150,000, and the parties established a payment plan. Hartis agreed to pay Century $50,000 of this debt on May 15, 2002 and to pay the remainder in four quarterly installments of $25,000 each, beginning on August 1, 2002. Hartis made the first two payments totaling $75,000, but failed to make payments due on November 1, 2002 and February 1, 2003.

By February 2003, Hartis had reported additional sales of Century's consigned furniture with a wholesale value of $135,173.25.[3] After deducting these reported sales from Hartis's April 2002 inventory, Century expected that in February 2003, Hartis possessed Century furniture with a wholesale value of $94,551.00. Hartis also incurred additional debts to Century during this time. As a result of sales on other accounts and sales of floor samples, Hartis's total debt to Century in February 2003, including payments due under the Key Agreement, totaled $256,432.03.

### February 12, 2003–March 17, 2003

Hucks testified that Hartis offered to pay his outstanding debt by turning over merchandise listed in three inventory spreadsheets that Hartis emailed to Hucks on February 12, 2003. One spreadsheet listed merchandise stored in Dallas and identified with the Durango Trading Company (the "Durango Inventory File"); another listed imported goods stored in a warehouse in High Point (the "High Point Inventory File").[4] The third spreadsheet

---

1. Century also sold furniture directly to Showroom.

2. The wholesale value of the missing furniture was $225,206.64.

3. Century did not insist on payment of the full amount, but instead agreed to accept $89,527.75 in full satisfaction for these sales.

4. Neither file is in the record.

was identified as "Century 2003 Reconciliation, Item Listing, February 12, 2003" (the "Houston Inventory File"). The Houston Inventory File contains six columns with the headings, "Item," "Description," "Quantity on Hand," "Cost," "Ext Cost," and "Preferred Vendor." On the last page of this spreadsheet, the sum of the entries in the column marked "Ext Cost" is listed as $386,503.54.

On February 17, 2003, Hartis emailed Century two files labeled "CSR Inventory Reconciliation021803" and "Durango Inventory021803." The body of the email contains no text, but the stated subject is "Updated Inventory."

On February 18, 2003, Hucks wrote to Hartis as follows:

> Gene, I haven't had an opportunity to review the detail of your files below, but the CSR file seems high. When I took you're [sic] Dec. Inventory less January Sales, I came up with 296,529.20. (excluding Durango and High Point). That seemed reasonable based on the January sales figures that we discussed (approximately $150K to $160K with little to no margin). Your file below states 366,887.09. Any ideas?

On February 20, 2003, Hartis responded:

> I was trying to get a picture of the Century inventory and left the subtotal in the figures. I think that the Century inventory was added in twice. I am forwarding a corrected copy that subtotals the Century inventory and then backs out the Century goods.... Also attached is a listing of the Century items cleared in Jan./Feb. The merchandise at Ampac in High Point does not belong to [Showroom].... There is also additional merchandise at Ampac from the

Chinese company that came in with the goods designated for me. We do not own any of it, however.

Sometime between February 20 and March 17, 2003, Century picked up five truckloads of consigned and third-party furniture from Hartis's warehouses.

### Transfer of Consigned Furniture

The parties do not dispute their mutual understanding that some of the transferred furniture was held on consignment, or that, after retrieving the consigned furniture, Century removed it from the list of consigned items held in trust, effectively giving Hartis a "dollar-for-dollar" credit for these items. The initial wholesale cost of these goods, and thus the credit applied to Hartis's debt upon their return, totals $64,784.75.[5] With the exception of items that were simply misidentified on the party's lists—and Hartis testified at trial that these constitute an insignificant amount—the shortfall is the result of missing inventory. When asked at trial if he sold an additional $30,000 of consigned Century furniture and again failed to pay Century, Hartis responded, "Possibly."

### Transfer of Third–Party Furniture

The remainder of the furniture transferred to Century consisted of furniture manufactured by third parties. The third-party furniture was not in its original packaging and had previously been displayed; Hartis was unsure of its age. Century sold this furniture to its sister company, Boulevard, for an amount Century identified as market value.

On March 17, 2003, Hucks emailed Hartis as follows:

> Gene, Please see the attached file per our conversation. The *first* tab contains a recap of your liability. The *second* tab

---

**5.** This amount is approximately $29,766.25 less than the value of the consigned goods reported by Hartis in his earlier email.

contains a "summary" of the inventory picked up. The *third* tab contains the "detail" of the inventory picked up. The *fourth* tab contains the remaining consignment inventory prior to the pick-up. Per our conversation, let's discuss further on Friday.

One or more of the files attached to the email contained the information that, as a result of the transfer of the third-party goods, Century had applied a credit of $68,911.00 to Hartis's outstanding debt. This amount represented 40% of the price Hartis listed for the items in the Houston Inventory File attached to his email of February 12, 2003; according to the evidence presented at trial, this is also the amount for which Century sold the property to Boulevard. Century credited this amount to Hartis's debt, leaving an outstanding balance of $105,013.27. Hartis made no further payments, and there is no evidence of any further written communications.

### The Trial

Century brought suit on a sworn account against Hartis, adding claims for quantum meruit, breach of contract, fraud, and conversion. Hartis asserted a counterclaim for breach of contract, and the case was tried to the bench on June 16, 2005.

At trial, Hucks testified that he and Hartis had agreed that the market price for the third-party goods would be applied to Hartis's outstanding debt (i.e., the debt that Hartis owed Century under the Key Agreement and the debt that his company owed Century for consigned goods). Hucks further testified that in North Carolina, where Century is headquartered, liquidation prices are 40–50% of the wholesale price, and when sold through a retailer, the market value for furniture is 50–

60% of the wholesale price.[6] These prices apply to goods out of the box on the showroom floor. Here, the transferred goods were wrapped in blankets, and Hartis admitted that the goods were out of the box and had been on display.

Hartis admitted that he did not comply with the terms in the Key Agreement requiring him to give Century liens on the existing and future inventory. Initially, he also testified that he never had any discussions with Century concerning discounts to the price he identified for the third-party goods. Although he subsequently testified that Century offered to take the goods at market price, Hartis stated that he refused the offer.

According to Hartis, he instructed Century to examine the goods in Houston and accept only those that it considered salable. He admitted that he knew Century would sell the goods to its sister company, but testified that he could have liquidated the third-party goods for a 33–40% profit. In contrast, Century produced evidence that in November 2002, Hartis's company was selling furniture at a 50–80% reduction from retail prices. Most of the items listed in Hartis's inventory of February 12, 2003 would have been among those items offered for sale at reduced prices in November 2002.

During closing argument, Hartis argued that the case was governed by Article 2 of the Uniform Commercial Code. After the trial court requested post-trial briefing on the issue, Century objected on the grounds that "the UCC argument is not made in the pleading." The trial court suggested that Century address this objection in its post-trial brief.

On June 21, 2005, Century moved to reopen the evidence in order to introduce a

---

6. Hucks also testified that on the day before trial, he completed a transaction with a retailer that conducts operations in Florida and Houston. According to Hucks, the furniture sold in this transaction was valued at "50 cents on the dollar."

security agreement, a UCC financing statement, and evidence regarding the date on which Century sold the third-party furniture to Boulevard. Hartis opposed the motion, and the trial court denied it. On June 22, 2005, Hartis moved "for a trial amendment to incorporate Article 2 into his contract pleadings." This motion also was denied.

On July 22, 2005, the trial court entered its final judgment in favor of Century and ordered Hartis to pay the principal sum of $105,103.27 plus prejudgment and post-judgment interest and reasonable attorneys' fees.[7] Hartis requested findings of fact and conclusions of law, and after he filed a notice that they were past due, the trial court issued its findings and conclusions on October 4, 2005. In pertinent part, the trial court wrote as follows:

> Century pleaded and proved a sworn account by which Hartis had acquired from Century furniture to be sold in his retail furniture store. Century proved that the amount due, owing and unpaid on that account was $30,013.27.
>
> The court's holding on Century's sworn-account claim mooted Century's *quantum meruit* claim. Century either abandoned or failed to bear its burden to prove Hartis'[s] liability for fraud and conversion.
>
> The agreement at issue in Century's breach-of-contract claim was the Key Points of Agreement signed by Hartis and Century on April 29, 2002. As one of the terms of that agreement, Hartis agreed to pay—and Century agreed to accept—$150,000 for "sold" inventory that had been worth $225,000. By paying only half of the $150,000 he had agreed to pay, Hartis breached the

agreement.... The court holds that Hartis is liable for the $75,000 he failed to pay, but that the $75,000 "discount" does not constitute damages arising out of a breach of the contract. Accordingly, Century's recovery on its breach-of-contract claim is limited to $75,000.

> Hartis'[s] counterclaim for breach of contract fails both because he failed to bear his burden to prove the existence of a valid agreement and because any such agreement would have been unenforceable under the Statute of Frauds— TEX. BUS. & COM. CODE ANN. § 2.201— which Century asserted and proved as an affirmative defense.

The trial court denied Hartis's motions for additional findings and for a new trial, and this appeal ensued.

## II. ISSUES PRESENTED

Hartis presents eleven issues for our review. In his first issue, Hartis contends the trial court improperly required him to prove the existence and terms of an agreement between the parties concerning the third-party goods transferred to Century in February 2003. He next argues that the trial court should have found, as a matter of law, that there was an agreement between the parties to credit Hartis for the third-party goods that Century obtained from him in February 2003; alternatively, he contends that the trial court's failure to make such a finding is against the great weight and preponderance of the evidence. Hartis argues in his third issue that the trial court should have found, as a matter of law, that the agreed price for each third-party item was the price listed in the Houston Inventory File he emailed to Century on February 12, 2003; alternatively, Hartis contends that the trial

---

7. The attorneys' fee award consisted of $20,000 incurred in obtaining the judgment, $2,000 if Century should successfully defend an attack on the judgment prior to appeal, $2,000 if Century succeeded in an appeal to the court of appeals, and $2,000 if Century succeeded in an appeal to the Texas Supreme Court.

court's failure to make such a finding is against the great weight and preponderance of the evidence.

Hartis raises additional sufficiency challenges in his fourth, fifth and sixth issues. In his fourth issue Hartis asserts that there is legally and factually insufficient evidence to support the trial court's implied finding that the parties agreed Century would credit Hartis for the market price of the third-party goods. Hartis argues in his fifth issue that the evidence is legally and factually insufficient to support the trial court's implied finding that the market price for these goods was forty percent of the price listed in the Houston Inventory File. In his sixth issue, Hartis contends the trial court should have found, as a matter of law, that the market price for the third-party goods was the price listed in the Houston Inventory File; alternatively, he argues that the failure to make such a finding was against the great weight and preponderance of the evidence.

Hartis asserts in his seventh issue that the trial court should have excluded the testimony of Brandon Hucks concerning the market price for the goods transferred to Century in February 2003 because Hucks was not designated as an expert. In his eighth issue, Hartis challenges the trial court's holding that his counterclaim was barred by the statute of frauds. Hartis contends in his ninth issue that the trial court should have conducted a new trial because Century failed to produce a controlling document in discovery. In his tenth issue, Hartis argues that the trial court should have held Century's failure to sell the goods in a manner complying with Article 9 of the Uniform Commercial Code disqualified Century from recovering a deficiency from him. Finally, in his eleventh issue, Hartis challenges the trial court's award of attorneys' fees.

## III. ANALYSIS

### A. Burden of Proof

■ Hartis asserts in his first issue that the trial court improperly placed the burden on him to prove the existence and terms of an agreement between the parties concerning the goods picked up by Century in February 2003. We disagree. Hartis pleaded payment as an affirmative defense to Century's suit on a sworn account; thus, he bore the burden to prove this defense. *See* TEX. R. CIV. P. 94, 95; *Sw. Fire & Cas. Co. v. Larue,* 367 S.W.2d 162, 163 (Tex.1963). Moreover, not only is his assertion of payment a matter in avoidance, but Hartis also pleaded breach of contract as a counterclaim, and bears the burden of proof on his own claims.

In support of his argument that the trial court improperly shifted the burden of proof, Hartis relies on *Willis v. Jenkins,* 472 S.W.2d 600, 602 (Tex.Civ.App.-Tyler 1971, no writ). In *Willis,* the Twelfth Court of Appeals observed the unexceptional rule that a defendant bears the burden of proof on his counterclaim. *Id.* Thus, it undermines rather than supports Hartis's argument. He also relies on *Olney Savings & Loan Association v. Farmers Market of Odessa, Inc.* 764 S.W.2d 869, 871 (Tex.App.-El Paso 1989, writ denied). There, the Eighth Court of Appeals held that in a suit by a lender for a deficiency judgment from loan guarantors after a non-judicial foreclosure sale, the lender, by alleging that it sold the property for a "fair and reasonable" value, assumed the burden of proof on that issue. *Id.* But *Olney* does not purport to apply outside of the real property context.[8]

8. Moreover, this court does not follow *Olney,* but has instead stated that "[c]ommercial reasonableness is a defense which must be pled by the debtor, not an element of the lender's cause of action. Only after the affirmative defense of commercial reasonableness is asserted, does the lender have the burden to

Finding no support for Hartis's arguments, we conclude the trial court properly placed the burden of proof; thus, we overrule his first issue.

## B. The Transfer as a Separate Agreement

In his second, third, and eighth issues, Hartis essentially complains of the following conclusion of law:

Hartis'[s] counterclaim for breach of contract fails both because he failed to bear his burden to prove the existence of a valid agreement and because any such agreement would be unenforceable under the Statute of Frauds—TEX. BUS. & COM. CODE ANN. § 2.201—which Century asserted and proved as an affirmative defense.

We begin our analysis with Section 2.201 of the Business and Commerce Code, which provides as follows:

(a) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more *is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought* or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

(b) Between merchants if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents, it satisfies the requirements of Subsection (a) against such party *unless written notice of objection to its contents is given within ten days after it is received.*

(c) A contract which does not satisfy the requirements of Subsection (a) but which is valid in other respects is enforceable . . .

. . .

(2) if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted; or

(3) with respect to goods for which payment has been made and accepted or which have been received and accepted (Section 2.606).

TEX. BUS. & COM. CODE ANN. § 2.201 (Vernon 1994) (emphasis added).

■ Contrary to Hartis's contentions, the exchange of emails in February and March 2003 does not constitute a writing satisfying the requirements described in section 2.201(a) of the Business and Commerce Code. It is undisputed that, under the terms of the Key Agreement, Hartis had already pledged his present and future inventory as collateral securing the Note and agreed to perfect Century's lien on the inventory. It is also undisputed that, at

---

offer proof that the sale was commercially reasonable." *McDonald v. Foster Mortgage Corp.*, 834 S.W.2d 573, 576 (Tex.App.-Houston [14th Dist.] 1992, writ denied) (citation omitted); *see also* TEX. PROP. CODE ANN. § 51.003 (Vernon 2007); *Sowell v. Resolution Trust Corp.*, No. 14–92–00320–CV, —— S.W.3d ——, ——, 1996 WL 233727, at *3 (Tex.App.-Houston [14th Dist.] May 9, 1996, no pet.)

(recognizing that the sale of real property need not be reasonable, thus, the lender's receiver is not required to prove a foreclosure sale was reasonable to recover a deficiency from the guarantor). Other courts do not recognize such a defense at all. *See Pentad Joint Venture v. First Nat'l Bank of La Grange*, 797 S.W.2d 92, 95–97 (Tex.App.-Austin 1990, writ denied).

the time the furniture was transferred, Hartis had defaulted on the Note. Nothing in the exchanged emails indicates the parties intended to modify their agreement or execute a new and separate contract, particularly since the transfer of these goods to Century in the event of Hartis's default was already encompassed within the Key Agreement. Moreover, none of the writings contain an offer or agreement that Century would pay Hartis the amount listed in the Houston Inventory File for each third-party item or credit that amount against Hartis's outstanding debt.

 Hartis also contends that, taken individually or collectively, the Houston Inventory File, the February 18, 2003 email from Hucks to Hartis, and a file entitled "Houston Inventory, 3rd Party Inventory Picked–Up" constitute a "confirmatory memoranda." He then relies on section 2.202 of the Business and Commerce Code to argue that parol evidence can be used to explain variances in the quantities of transferred goods, but not to vary the price from that stated in the Houston Inventory File.

The statute at issue provides in pertinent part:

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing *intended by the parties as a final expression of their agreement* with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

(1) by course of performance, course of dealing, or usage of trade (Section 1.303); and

(2) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

TEX. BUS. & COM. CODE ANN. § 2.202 (Vernon Supp.2006) (emphasis added).

Examining the writings at issue, a reasonable factfinder could conclude that Hartis failed to show the series of emails and attachments were intended as a final expression of the parties' agreement.[9] First, Hartis's email of February 12, 2003 is not sufficiently specific to constitute an offer. Although it attached the Houston Inventory File, the Key Agreement already required inventories to be performed monthly.[10] Moreover, the email and attachment could not be reasonably construed as an offer for sale because Century already owned the majority of Century products included on the list. Most of the Century furniture was held on consignment, and although Century had the right to retrieve these goods at any time if the terms of the Key Agreement were not satisfied, Hartis's email and attachment did not treat these items differently from the third-party goods owned by Hartis or Showroom. Finally, we note that the Key Agreement

9. In the alternative, Century argues that, by failing to object (as required by section 2.201(b) of the Code) to its "confirmatory" email stating that it would credit 40% of the value stated by Hartis to his debt, Hartis entered an enforceable agreement under section 2.207. *See* TEX. BUS. & COM. CODE ANN. §§ 2.201(b), 2.207 (Vernon 1994). This argument, however, is contrary to the trial court's finding that Hartis failed to prove the existence of a valid agreement and that any such agreement would have been unenforceable under section 2.201. *See id.* § 2.201(a) ("Except as otherwise provided in this section...."). Century also relies on section 2.305(d) to argue that the parties never intended to contract in the absence of an agreement on price, and thus, the law implies a reasonable price. *See id.* § 2.305(d). We do not reach this argument.

10. Hartis later disclosed that this inventory was current only as of December 31, 2002.

required Hartis to maintain a volume of Century goods constituting "no less than 85% of the net usable space by January 1, 2003" and that his progress toward that target was to be reviewed quarterly. On its face, the Houston Inventory file and the inventory reconciliations appear to respond to this requirement. Similarly, Hucks's email to Hartis on February 18, 2003 and Hartis's response on February 20, 2003 can reasonably be characterized as a discussion concerning Hartis's compliance with the Key Points of Agreement, both by accurately reporting sales and by maintaining Century's inventory prominence.

In sum, there is no evidence that the communications on which Hartis relies confirm a new contract, rather than addressing an offset to a preexisting debt; thus, sections 2.201(b), 2.201(c)(2), and 2.203 of the Uniform Commercial Code are inapplicable. *See id.* §§ 2.201(b), (c)(2), 2.202. For similar reasons, there is no evidence of an agreement that is "valid in other respects," and thus section 2.201(c)(3) does not apply. *See id.* § 2.201(c)(3). We therefore overrule Hartis's second, third, and eighth issues.

### C. Implicit Finding that the Parties Agreed to Apply a Credit Against Hartis's Debt in the Amount of the Market Price for the Third–Party Furniture

■ Hartis's fourth and fifth issues concern the legal and factual sufficiency of the evidence supporting the trial court's im-

plied findings.[11] In his fourth issue, Hartis challenges the implied finding that the "parties' agreement was that the price to be paid, or credited against what Hartis owed Century, for the goods picked up by Century from Hartis'[s] warehouse in February[ ] 2003 was to be market price, in that such finding was supported by no evidence, or alternatively, by insufficient evidence." In his fifth issue, Hartis argues that the "trial court should not have implicitly found that the market price for the goods picked up by Century from Hartis'[s] warehouse in February[ ] 2003 was 40% of Hartis'[s] stated price, in that such finding was supported by no evidence, or alternatively, by insufficient evidence." Hartis's sixth issue also concerns the market price for the transferred goods. There, he argues that the trial court should have found, as a matter of law, that "the market price for the goods was the price specified" in the Houston Inventory File, or alternatively, the failure to make such a finding was against the great weight and preponderance of the evidence.

Each of these issues requires us to review the entire record using the same standards of legal and factual sufficiency applicable to a jury's answers. *See Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994). In evaluating legal sufficiency, we credit evidence that supports the judgment if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *See City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). A party

11. We note that Hartis asked the trial court to memorialize these implied findings in additional findings of fact, and that the trial court refused his request. Hartis does not challenge the trial court's refusal to make his requested additional findings, and neither party contends that this refusal precludes us from treating these findings as implied. *See Vickery v. Comm'n for Lawyer Discipline,* 5 S.W.3d 241, 253 (Tex.App.-Houston [14th Dist.] 1999, pet. denied) (suggesting that a

finding of fact that was expressly refused by the trial court cannot be supplied by implication on appeal). We therefore presume the parties agree that the requested additional findings were "disposed of directly or indirectly by the original findings, and the failure to make additional findings was not prejudicial to the appellant." *See Levine v. Maverick County Water Control & Improvement Dist. No. 1,* 884 S.W.2d 790, 796 (Tex.App.-San Antonio 1994, writ denied).

attacking the legal sufficiency of an adverse finding on an issue on which he had the burden of proof must demonstrate on appeal that the evidence establishes, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 241 (Tex.2001). If a party attacks the legal sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, the party must demonstrate on appeal that no evidence supports the adverse finding. *Arrellano v. State Farm Fire & Cas. Co.,* 191 S.W.3d 852, 855–56 (Tex.App.-Houston [14th Dist.] 2006, no pet.). When a party attacks the factual sufficiency of a finding, we set it aside only if it is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Haas v. Ashford Hollow Cmty. Improvement Ass'n, Inc.,* 209 S.W.3d 875, 887 (Tex.App.-Houston [14th Dist.] 2006, no pet.).

We conclude that, under the applicable standards of review, the implied findings Hartis challenges are supported by the record evidence. At trial, Hartis agreed that Century offered to apply a credit against his debt in the amount of the market value of the third-party furniture. Although Hartis contends that he rejected the proposal, the trial court could have reasonably disbelieved that contention. A finding that the market value of the third-party furniture was equal to forty percent of the price listed in the Houston Inventory File was supported by testimony from Brandon Hucks regarding both valuation and actual sales price.

On the other hand, there is no evidence in the record that Hartis offered these goods to Century, to the public, or to any other potential purchaser at the prices list-

ed in the Houston Inventory File. Regarding the prices on this list, Hartis testified as follows:

Q: Okay. And where did you get the cost prices that are listed on Exhibit Number 1 [i.e., the Houston Inventory File]?

A: *These were the prices that are entered into our system when we receive the merchandise.*

Q: So there would be invoices when you received it-when you received the merchandise that would support these dollar figures, correct?

A: That's correct.

Q: And who has those documents?

A: I'm not sure.[12]

Thus, Hartis testified regarding the time when the figures were entered, but offered no evidence explaining what the figures represent.

In a bench trial, the trial court is the sole judge of the credibility of the witnesses and may take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Nelson v. Najm,* 127 S.W.3d 170, 174 (Tex.App.-Houston [1st Dist.] 2003, pet. denied). Thus, the trial court could have found Hartis's testimony less than credible and may not have inferred from his testimony that the amounts he listed in the Houston Inventory File accurately represented the original wholesale price of the third-party goods.

In sum, the record is legally and factually sufficient to support the trial court's findings that the parties agreed to credit Hartis's account for the market value of the transferred third-party goods, and the market value of these goods was forty

---

**12.** Hartis further testified that he owns 100% of the stock in Showroom, and that the company filed for bankruptcy. However, Hartis did not produce the invoices to the bankruptcy trustee, although the invoices would list the wholesale value of these goods.

percent of the price listed on the Houston Inventory File. We therefore overrule Hartis's fourth, fifth, and sixth issues.

### D. Testimony of Brandon Hucks

█ Hartis next contends that, because Century failed to timely designate Brandon Hucks as an expert, the trial court erred in admitting his testimony concerning the market price for third-party goods because Century did not show that its failure to designate Hucks as an expert was excused for good cause, or that the failure did not unfairly surprise or prejudice Hartis. *See* Tex. R. Civ. P. 193.6. Hartis further contends that, in the absence of Hucks's expert testimony concerning the market price of the third-party goods, there is no evidence to support such a finding. We review the trial court's decision to allow Hucks's testimony for an abuse of discretion. *See Tamez v. State,* 205 S.W.3d 32, 43 (Tex.App.-Tyler 2006, no pet.).

We begin our review by placing Hartis's objection in context. Hucks initially testified that Century was typically able to resell its own product for "40 to 50 cents on the wholesale dollar" when the product is out of the box and has been displayed in a showroom; moreover, he has personally had experience reselling such furniture. He further testified that when the product is still in the box, Century can sell it to liquidators for "50 to 60 cents on the wholesale dollar." Hucks also testified that he had made such a sale the day before trial with a Houston retailer or liquidator.

Hartis did not object to any of this testimony on the grounds that Hucks was an undesignated expert. He raised this objection only when Hucks was subsequently asked "how did you arrive at 40 percent as a discount for this third-party merchandise?" Hucks responded:

The decision points [sic] to credit Mr. Hartis 40 percent of the listed price of his inventory was based on the prior experience that I have in selling items of first quality in the box—slow turning, in the box, for 50 to 60 cents on the wholesale dollar, in my experience. And my experience of selling our showroom samples, that I assume would be in similar condition to what Mr. Hartis had on his floor, at 40 to 50 cents on the wholesale dollar out of the box. So the 40 cent basis came from basically drawing on, this is the type expectation that we get for our goods in similar condition.

Hucks further testified that Century actually sold the furniture for this price to its sister company, Boulevard.

Hartis argues that "[t]estimony concerning market price of trade goods must come from an expert," and in support of this contention, relies on *Cass v. Stephens,* 156 S.W.3d 38, 64–65 (Tex.App.-El Paso 2004, pet. denied). But *Cass* involves the competency of an accounting expert to testify regarding (a) whether operators followed correct accounting procedures, (b) the market value of converted oil and gas equipment, and (c) whether defendants acted with malice in converting the equipment. It does not concern trade goods or the necessity for expert testimony.

Hartis next relies on *50–Off Stores, Inc. v. Banques Paribas (Suisse), S.A.,* for the proposition that "[a] sale at other than arms length is no evidence of a fair market transaction." 180 F.3d 247, 255 (5th Cir. 1999). But, in that case, the Fifth Circuit Court of Appeals held that if a buyer never intended to pay the price he negotiated for stock, then his offer is not a useful indication of fair market value, because it only shows the price the seller would accept and not the price an arms-length purchaser would pay. *Id.* Here, however, Hucks

testified without objection regarding the price an arms-length purchaser would pay.

Finally, Hartis contends that the trial court was required to accept the figures included in the Houston Inventory File as the market value or the agreed value of the third-party goods. Specifically, Hartis argues that "[w]hile the fact finder is ordinarily free to disbelieve even uncontroverted testimony, in a proper case such testimony, even that of an interested witness, establishes the matter testified to as a matter of law." In support of this argument, Hartis relies on *Schwartz v. Pinnacle Communications*, 944 S.W.2d 427 (Tex. App.-Houston [14th Dist.] 1997, no writ).

In *Schwartz*, we held:

> [W]hile the fact finder is charged with the duty of deciding issues raised by conflicting evidence, *when the evidence is not conflicting*, the fact finder may not disregard uncontradicted testimony in order to decide an issue in accordance with its own wishes. This exception applies even when the testimony comes from an interested witness if certain circumstances exist to ensure its reliability. If *the interested witness'[s] testimony is clear, direct, and positive, as well as free from contradiction, inaccuracies, and suspicious circumstances*, it is taken as true, as a matter of law.

*Id.* at 434 (citations omitted, emphasis added). The italicized circumstances are not present here.

■ On appeal, Century persuasively argues that Hucks's testimony is admissible as the factual testimony of a lay witness under Texas Rule of Evidence 701 because Hucks's statements were rationally based on his perceptions and helpful to a clear understanding of his testimony. *See* Tex. R. Evid. 701 (restricting the opinion testimony of a lay witness to "those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of

the witness'[s] testimony or the determination of a fact in issue"). Century further argues that expert testimony is not required to prove reasonable price or actual damages. *See Laprade v. Laprade*, 784 S.W.2d 490, 492 (Tex.App.-Fort Worth 1990, pet. denied) (stating that "it is largely discretionary with the judge as to whether a witness is qualified to testify as to market value" and holding that the trial court did not err in admitting lay witness testimony concerning the value of a business where the witness had knowledge of the business's accounts receivable, had run the business for five years, knew what was paid for each of the business's trucks, and knew the value of other, smaller businesses for sale). We agree with both contentions. Moreover, the testimony to which Hartis objected is cumulative of evidence previously admitted without objection, and thus error, if any, is harmless.

We hold the trial court did not abuse its discretion by admitting the challenged testimony, and we overrule Hartis's seventh issue.

## E. UCC Financing Statement

■ In his ninth issue, Hartis contends that the trial court should have granted a new trial because Century failed to produce a controlling document in discovery. Specifically, Hartis complains that Century did not produce a requested UCC financing agreement until after trial. Although Century moved to reopen the evidence to admit the document, *Hartis objected.* Hartis now argues that the document contains a provision that requires it to be interpreted under North Carolina law, and that Century failed to comply with North Carolina statutes that prevent a secured party from recovering a deficiency unless that party proves (a) notice of planned disposition complying with the statute and (b) commercially reasonable disposition of the collateral. Hartis contends that no

evidence of a notice of disposition was offered, and, if we exclude Hucks's testimony regarding market value, no evidence of commercial reasonableness is in the record.

■ First, in his motion for new trial, Hartis made no argument based on North Carolina law. Thus, these arguments are waived. TEX. R. APP. P. 33.1. Second, inasmuch as Hartis objected to the reopening of the evidence and asked the trial court to exclude the document as untimely and as a discovery sanction, Hartis has already been granted the relief he sought, and the court's error, if any, was invited. Hartis is therefore estopped from raising this issue on appeal. *See Tittizer v. Union Gas Corp.,* 171 S.W.3d 857, 861 (Tex.2005) (per curiam). For each of these reasons, we overrule Hartis's ninth issue.

### F. Compliance with Article Nine of the Uniform Commercial Code

■ In a related argument, Hartis contends that the trial court should have held that Century's failure to sell the third-party goods in a manner complying with Article Nine of the Uniform Commercial Code disqualified it from recovering a deficiency from Hartis. This argument depends on the admission of the security agreement, and Hartis successfully argued for its exclusion. Here, too, the court's error, if any, was invited; thus Hartis is estopped from raising this issue on appeal. *See id.* Accordingly, we overrule Hartis's tenth issue.

### G. Attorneys' Fees

■ Finally, Hartis argues that the attorneys' fee award should be vacated be- cause the damage award must be reversed. For the reasons discussed above, this argument is without merit. In the alternative, he asks us to reform the judgment because the trial court awarded fees exceeding the amount stipulated.[13] Specifically, at the close of Century's case-in-chief, Century's attorney, Patrick J. Schurr, recited the parties' stipulation that Century's "attorneys' fees will be $18,000 through the date of trial" and that the fees for Hartis's attorney, Joseph A. McDermott, III, were $16,000. He added, "And then, appellate fees of $2,500 for Motions for New Trial, Court of Appeals, et cetera." McDermott then added that the parties stipulated "to an amount, not entitlement...." The trial court accepted the stipulation, but after the close of evidence, requested post-trial briefing on the application of the Uniform Commercial Code.

■ Ordinarily, the amount of attorneys' fees awarded rests within the sound discretion of the trial court and will not be reversed absent a showing of abuse of that discretion. *Ragsdale v. Progressive Voters League,* 801 S.W.2d 880, 881 (Tex.1990) (per curiam). Here, no such abuse of discretion has been demonstrated. When a contract case is tried without a jury, the trial court may take judicial notice of (1) the contents of the file to estimate the work involved; and (2) the customary fee for the claim involved, which is presumed to be reasonable. TEX. CIV. PRAC. & REM. CODE ANN. § 38.004(1) (Vernon 1997); *Lee v. Perez,* 120 S.W.3d 463, 469 (Tex.App.-Houston [14th Dist.] 2003, no pet.); Hon. Scott A. Brister, *Proof of*

---

13. Hartis does not challenge Schurr's qualifications or the award of attorneys' fees generally. He also does not allege that the attorneys' fees stipulated or awarded include payment for legal work performed solely in connection with Century's fraud and conver- sion claims. Rather, his entire argument for reformation of the attorneys' fee award consists of the single sentence, "Alternatively, the award of fees is greater than the parties' stipulation and should be reformed to that amount."

*Attorney's Fees in Texas,* 24 St. Mary's L.J. 313, 333 (1993). The trial court is not bound by stipulations or uncontroverted evidence regarding attorneys' fees. *See Jackson v. Barrera,* 740 S.W.2d 67, 68–69 (Tex.App.-San Antonio 1987, no writ) (holding that a stipulation is "some evidence" of attorneys' fees); *Nat'l Mar–Kit, Inc. v. Forrest,* 687 S.W.2d 457, 460 (Tex. App.-Houston [14th Dist.] 1985, no writ) (affirming award of attorneys' fees that differed from the uncontroverted evidence). We therefore assume that, after requesting post-trial briefing, the trial court took judicial notice of the usual and customary fees for the additional work and the efforts of the attorneys, and added a reasonable sum to the previously stipulated amount. *See Lacy v. First Nat'l Bank of Livingston, Tex.,* 809 S.W.2d 362, 367 (Tex.App.-Beaumont 1991, no writ) (noting that the trial court is presumed to have taken judicial notice of reasonable and customary attorneys' fees). We overrule Hartis's eleventh issue.

### IV. Conclusion

We hold the trial court properly placed the burden on Hartis to prove the elements of his counterclaim and affirmative defenses, and the evidence supports the trial court's express or implied findings of fact and conclusions of law. We further hold the trial court did not abuse its discretion in admitting the testimony of Brandon Hucks. Finally, we presume that in awarding attorneys' fees, the trial court considered the parties' stipulations and took judicial notice of the reasonable and customary fees in the area for the work performed. We overrule Hartis's remaining issues under the doctrines of invited error and waiver, and affirm the judgment of the trial court.