**Affirmed and Memorandum Opinion filed November 29, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-11-00940-CV

---

## ROBERT PARKER, OSCAR MACIAS, AND PARKER MAC, LLC, Appellants

### V.

## HTR, INC., Appellee

---

**On Appeal from the County Court at Law No. 3
Harris County, Texas
Trial Court Cause No. 947736**

---

## M E M O R A N D U M   O P I N I O N

Appellants Robert Parker, Oscar Macias, and Parker Mac, LLC assert that the trial court erred in concluding that they breached an oral commission agreement with appellee HTR, Inc. In four issues, they assert that (a) the agreement at issue is unenforceable because it violates the statute of frauds provision of the Texas Uniform Commercial Code—Sales (the "Texas UCC");[1] (b) because the agreement is unenforceable, attorney's

---

[1] *See* Tex. Bus. & Com. Code § 2.101 (short title), § 2.201 (statute of frauds).

fees were not appropriate; and (c) the evidence is legally and factually insufficient to support part of the trial court's damages award. We affirm.

## BACKGROUND

This suit arose because Mike Starling, president of HTC, Inc., discovered that Robert Parker and Oscar Macias sold industrial equipment directly to two customers Starling had referred to them: Morris Industries and Ellison Technologies. HTC sued Parker, Macias, and the company they formed, Parker Mac LLC, in September 2009, seeking a ten-percent commission on the proceeds from these sales. The case was tried to the bench on June 8, 2011. The following evidence was presented.

Parker and Macias began building industrial equipment together in 2005 in the Midland, Texas area, apparently working under the name of "Parker Mac Fabrication."[2] Parker primarily managed the financial side of the business, while Macias was tasked with fabrication and some bidding of projects. Macias had been acquainted with Starling since the mid-1980s. Starling's company, HTR, is located in the Houston area. Starling had referred business to Macias over the course of their acquaintance. Starling continued to refer customers to Parker and Macias once the two went into business together. HTR generally received a commission from the sales Starling referred to Parker Mac Fabrication, although the parties never had any formal, written agreement.

Parker testified that, customarily, when Starling referred sales to Parker Mac Fabrication, he and Macias would submit quotes to HTR based on specifications provided by Starling. HTR would mark up the equipment prices and provide quotes to customers for the equipment. When the bid was accepted by the end customer, HTR would pay Parker Mac Fabrication half for the equipment up-front and the other half when the job was completed. Parker would not see the final invoice provided to the customer, so he was not aware of the exact amount of HTR's commission on these sales.

_____

[2] On January 13, 2009, Parker and Macias completed a certificate of formation of Parker Mac, LLC. This certificate of formation, by its terms, became effective when the document was filed by the Texas Secretary of State on March 27, 2009. The certificate of formation was admitted into evidence. The sales that form the basis of this suit, however, occurred prior to the formation of Parker Mac, LLC.

2

Parker testified that he, Macias, and Starling/HTR had successfully completed about seven or eight jobs working in this manner. Parker agreed that a ten percent commission would not be unreasonable for providing this type of referral service.

Starling described their business together as follows: "Sometimes they [Parker, Macias, and Parker Mac Fabrication] would send me a quote that was my cost. Sometimes [Macias] would send me a quote and say that your commission of ten percent is built into this price." He stated that they "had the same terms on almost every deal. It was either 50 percent down and 50 percent upon shipment or 50 percent down and 40 percent upon shipment, 10 percent upon installation." Starling testified that generally, he had been paid a ten percent commission by other industrial manufacturers when he sold their equipment, that he built a ten percent commission into the "deals" he worked with Parker Mac Fabrication, and that he works on a ten percent commission at the present time. He acknowledged on cross examination that he had no records to show that he had ever billed Parker, Macias, or Parker Mac Fabrication directly for his commissions; rather, he testified that he was paid by invoicing the "end customer." He stated that if he was sent a "net figure" from Macias, he would mark the price up before he sent it to the customer, but that if he was sent a "gross figure," he would not.

Starling testified that he and Parker Mac Fabrication had an agreement that "[a]ny deal [he] brought to the table, [he] was entitled to a commission upon." Starling further testified that he had had a conversation with both Parker and Macias in which Parker had assured him that any customer Starling brought to Parker and Macias would "always" be Starling's. Starling testified that a ten percent commission is "a common commission paid on machinery sales."

Regarding the specific sales in question, the parties testified as follows. Starling testified that in September 2007, he was contacted by Mike Stern of Morris Industries. Morris Industries is located in New Jersey. Morris Industries was looking to purchase pipe feed and turning tables. Starling explained that HTC initially provided the quotes to Morris Industries and that he worked with Macias in preparing several quotes regarding

3

these tables, communicating "back and forth" with Mike Stern. According to Starling, Stern wanted to visit the location where the tables were built. Starling informed Stern that the tables were built in Midland, Texas and told Parker that Stern wanted to visit their site. Stern visited the site where the tables were fabricated.

On November 25, 2008, Gregg Edwards, the office manager for Parker Mac Fabrication, provided an equipment price quote directly to Stern at Morris Industries. This quote was for fabrication and installation of three equipment tables, for a total price of $156,000.00. This quote was sent via email, and a copy of the email was sent to Starling at HTR.[3] Morris Industries accepted the quotation, ordered the tables from Parker Mac Fabrication, and paid for them. HTR did not receive any commission on the sale of this equipment. On January 29, 2009, HTR invoiced Parker Mac Fabrication for one-half of "commission due for Morris Pipe & Supply Co." HTR invoiced Parker Mac Fabrication for $7,800, a ten percent commission on half of the total sale to Morris. HTR invoiced Parker Mac Fabrication for the remaining half of the ten percent commission on March 11, 2009. Both invoices were admitted as evidence.

Parker testified that Starling was not owed any commission for this sale because he had not referred this job to Parker Mac Fabrication. Instead, according to Parker, another individual had referred this job to Parker Mac Fabrication. Parker did not dispute the equipment price reflected in the invoice.

Starling testified that Ellison Technologies was the "very first customer" he brought to Parker Mac Fabrication in 2004 or 2005. Starling received commissions for the Ellison Technologies sales he referred to them. Parker and Macias sold additional equipment directly to Ellison Technologies in 2007 and again in 2008. Starling was not paid a commission on these later sales to Ellison Technologies. The record contains an undated invoice from HTR to Parker Mac Fabrications reflecting commissions due on "work performed on or about: 03/01-06/01/2007 & 11/24/2008" for equipment sold to

---

[3] This email and quote were admitted into evidence.

4

Ellison Technologies. This invoice also reflects a ten percent commission owed on equipment sold to Ellison; the total amount invoiced was $6,525.

Parker testified that the jobs reflected in this invoice were not jobs that Starling or HTR brought to Parker Mac Fabrication. Parker explained that, although HTR initially referred Ellison Technologies to Parker Mac Fabrication, the equipment sales in the invoice were obtained through Parker Mac Fabrication's employee's "own efforts." Parker did not dispute the sales price of the equipment reflected in the invoice. Starling admitted that he had not directly referred the sales at issue in this invoice to Parker Mac Fabrication. According to Starling, Parker acknowledged that he owed HTC the commissions on the sales to Morris Industries and Ellison Technologies, but Parker was unable to pay these commissions because he was "in financial distress."

Starling's attorneys testified regarding their fees, and the trial court took the matter under advisement. On July 26, 2011, the trial court signed a judgment in favor of HTR, awarding it $22,125.00 in damages and $18,000 in attorney's fees. The trial court signed findings of fact and conclusions of law on September 20, 2011. This appeal timely ensued thereafter.

## ANALYSIS

### A. Statute of Frauds

In their first issue, Parker, Macias, and Parker Mac, LLC assert that their oral agreement with HTC is barred by the statute of frauds provision contained in the Texas UCC. This provision provides, in pertinent part, as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker.

Tex. Bus. & Com. Code § 2.201(a).

5

The statute of frauds is an affirmative defense that must be pleaded or it is waived. *See* Tex. R. Civ. P. 94. However, appellants never raised the Texas UCC statute of frauds in the underlying proceedings. Rather, they raised the general statute of frauds codified in Texas Business & Commerce Code section 26.01(b)(3).[4] The general statute of frauds provides, in pertinent part, that an agreement that is not to be performed within one year is not enforceable unless the agreement is in writing and signed by the person to be charged with the agreement. *Id.* § 26.01.

Regardless of its applicability to the facts of this case, appellants have abandoned their general statute of frauds argument on appeal. And because they did not raise the Texas UCC statute of frauds below, they have waived that affirmative defense.[5] *See* Tex. R. Civ. P. 94; *see also Adams v. H & H Meat Prods., Inc.*, 41 S.W.3d 762, 776 (Tex. App.—Corpus Christi 2001, no pet.) (holding that because appellant pleaded affirmative

---

[4] Appellants pleaded the statute of frauds as a bar to HTC's recovery in their answer, asserting that "claims arising from an oral contract within the statute of frauds are fatally flawed and may be dismissed without opportunity to amend" and citing to *Zaremba v. Cliburn*, 949 S.W.2d 822 (Tex. App.—Fort Worth 1997, writ denied). This case involved an oral contract subject to the general statute of frauds. *See id.* at 826–27 (citing section 26.01 of the Texas Business & Commerce Code). Appellants make no mention of a contract for the sale of goods in their answer.

[5] Appellants have not claimed that this issue was tried by consent. *See* Tex. R. Civ. P. 67. Further, no mention of the UCC is made anywhere in the reporter's record. In fact, the only reference to the sale of goods or products during the bench trial is the following exchange between appellants' attorney and Starling, which has no bearing on the Texas UCC statute of frauds:

*Q.* Now, sir, your role in all of this is to, I take it, distribute products for the defendant -- is that correct -- or the defendants; is that correct?

*A.* Distribute products --

*Q.* Sell products?

*A.* No, I am selling products.

*Q.* Okay. The focus is to sell their goods; is that correct?

*A.* Yes.

*Q.* And no money ever is given to you unless a sale occurs; is that right?

*A.* That's correct.

*Q.* And you would agree the dominant factor in a sale would be the sale of the products of the defendants as far as this whole transaction you've sued over; is that correct?

*A.* That's correct.

defense only under Texas UCC statute of frauds and failed to plead affirmative defense under general statute of frauds, he had waived general statute of frauds defense on appeal). Accordingly, we overrule appellants' first issue.

Further, in light of our disposition of appellants' first issue, we need not address their second issue in which they claim HTC was not entitled to attorney's fees because HTR's breach of contract claim was barred by the Texas UCC.[6]

## B. Legal and Factual Sufficiency of the Evidence

In their third and fourth issues,[7] appellants challenge the legal and factual sufficiency of the evidence to support the trial court's findings and conclusions regarding the sales and commissions related to Ellison Technologies. They specifically challenge the following findings and conclusions:

2. Plaintiff and Defendants had an enforceable oral contract in which Defendants promised to pay, and/or understood regardless of how or to whom payment for the sales was made, that Plaintiff was entitled to receive a ten percent (10%) of funds received commission on sales from business Plaintiff referred to Defendants as is further detailed in Findings of Fact 3-5.

3. Plaintiff referred two clients to Defendants for which it was entitled to the ten percent (10%) contractual commission, Morris Industries and Ellison Technologies for FMC Corporation. As a direct result of those referrals, Defendants sold goods and services to Morris Industr[ies] and received payment for same of $156,000; and Defendants sold goods and services to Ellison Technologies for FMC Corporation and received payment for same of $65,250.

4. Neither of the sales described in Finding of Fact No. 3 would have been possible or occurred without the efforts of HTR, Inc. Plaintiff identified the need of the buyers, had extensive conversations with them concerning the orders, and coordinated much of the

---

[6] We note that appellants did not object to attorney's fees on this basis. The only objection lodged to the testimony regarding attorney's fees at the bench trial was that HTC had not disclosed the amount of attorney's fees in response to appellants' requests for disclosures.

[7] Appellants cite no legal authority whatsoever in this section of their brief. *See* Tex. R. App. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations *to authorities* and to the record." (emphasis added.)).

7

communication between Defendants, the manufacturers of the equipment, and buyers.

5. Plaintiff, through its material and significant efforts in making the sales described in Finding of Fact 3, earned the ten percent (10%) commission, which commission is standard in the industry.

6. Defendants breached their contract with Plaintiff by refusing to pay the commissions to Plaintiff, Plaintiff suffered determinable monetary damages as a result of the breach, and Plaintiff is entitled to recover its damages from Defendants. The commissions that remained unpaid on April 9, 2009, $22,125, are the damages.

Findings of fact "have the same force and dignity" as a jury's verdict and are reviewable under the same standards of legal and factual sufficiency. *BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). When a legal sufficiency challenge concerns an issue on which the appellant does not bear the burden of proof, the court of appeals reviews it under a "no evidence" standard:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

*City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). When a party attacks the factual sufficiency of a finding, we set it aside only if it is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Hartis v. Century Furniture Indus., Inc.*, 230 S.W.3d 723, 734 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

Even if we were to agree with appellants that there is no support for findings four and five regarding the specific efforts HTC undertook in regards to the equipment sales to Ellison Technologies,[8] we conclude that there is ample support in the record for findings two, three, and six. First, as discussed above, Starling testified that he had an

---

[8] As noted above, Starling testified that he did not "directly" refer these sales to appellants.

arrangement with Parker and Macias whereby he would refer clients to them, and HTC would receive a ten percent commission on sales of industrial equipment to those clients.[9] Macias testified that, near the time that he and Parker went into business together, he and Starling had an express conversation in which he told Starling that if Starling sent Parker Mac Fabrication clients, Parker Mac would pay Starling a ten percent commission. This testimony supports the trial court's second finding and conclusion that the parties' "had an enforceable oral contract" in which Parker Mac agreed to pay Starling/HTC a ten percent commission on sales from business Starling/HTC referred to Parker Mac. Although Parker denied the existence of an ongoing agreement with Starling/HTC, the trial court is the sole judge of the credibility of the witnesses. *Hartis*, 230 S.W.3d at 734. The trial court may take into consideration all the facts and surrounding circumstances in connection with the testimony of each witness and accept or reject all or any part of that testimony. *Id.* Thus, the trial court could have found Parker's testimony less credible than that of Starling and Macias.

Second, Starling testified that he was responsible for referring Ellison Technologies to appellants. Macias agreed that Starling had initially referred Ellison Technologies to Parker Mac Fabrication. Parker testified that the first job Parker Mac Fabrication had done for Ellison was "set up" by HTC. Thus, there is no dispute that the relationship between Parker Mac Fabrication and Ellison Technologies was initiated directly by Starling's efforts. In fact, Starling testified that "Monty," the salesman from Ellison Technologies, contacted Parker and Macias directly regarding the tables at issue in this case, and they called Starling and asked what to do. Starling stated that he told Parker and Macias that Monty was "try[ing] to go around" him. According to Starling, Parker assured him that he would be paid a commission on "the deal."

---

[9] The existence of an oral contract is generally a question for the factfinder. *See Ward v. Ladner*, 322 S.W.3d 692, 698 (Tex. App.—Tyler 2010, pet. denied); *cf. Parker Drilling Co. v. Romfor Supply Co.*, 316 S.W.3d 68, 73 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) ("The existence of an implied contract involves inferences drawn from circumstantial evidence and is therefore a question of fact.").

9

This testimony supports the trial court's finding and conclusion number three regarding HTC's entitlement to the ten percent commission on the sales to Ellison Technologies as a "direct result" of Starling's referral of this "client" to Parker Mac Fabrication. Nothing in the record suggests that Parker Mac Fabrication had any connection to Ellison Technologies other than through the referral by Starling. Further, Starling stated that Parker told him that Parker "had been a salesman all his life and that he knew how valuable and how hard it was to establish customer relationships and that any customer of [Starling's] would always be [Starling's]." Again, although Parker testified that the sales to Ellison came about through Parker Mac's own efforts,[10] the trial court could have found his testimony less credible than that of Starling. *See id.*

Finally, there is no dispute that none of the appellants paid HTC for the commissions on the Ellison Technologies sales. HTC invoiced Parker Mac for these sales, and the appellants never disputed the prices reflected in these invoices. By failing to pay HTC the commissions that Starling earned on these sales, the appellants breached their oral agreement with HTC. Accordingly, the trial court's sixth finding and conclusion is supported by the record.

In sum, the evidence is legally and factually sufficient to support the trial court's findings that the parties had an enforceable oral contract whereby appellants would pay HTC a ten percent commission for sales to clients that were referred to them by Starling, that Starling referred Ellison Technologies to appellants and appellants made sales of $65,250 to Ellison, and that appellants breached their contract by failing to pay HTC the ten percent commission on these sales. These findings sufficiently support the trial court's judgment. We therefore overrule appellants' fourth and fifth issues.

---

[10] Parker's testimony indicates that this "work" was done during the initial project for Ellison referred by HTC.

## CONCLUSION

Having overruled appellants' issues, we affirm the judgment of the trial court.

/s/     Adele Hedges
Chief Justice

Panel consists of Chief Justice Hedges and Justices Brown and Busby.